STATE of Alaska, DEPARTMENT
OF NATURAL RESOURCES,
Appellant,

v.

TONGASS CONSERVATION
SOCIETY, Appellee.

No. S–5562.

Supreme Court of Alaska.

Jan. 17, 1997.

John P. Griffin, Assistant Attorney General, Charles E. Cole, Attorney General, Juneau, for Appellant.

Thomas S. Waldo, Sierra Club Legal Defense Fund, Inc., Juneau, for Appellee.

Before RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, Justice pro tem.[*]

*OPINION*

MATTHEWS, Justice.

In 1992 the Cape Fox Corporation and the Department of Natural Resources (DNR) agreed to a land exchange. Because the state land to be exchanged had an estimated value greater than $5,000,000, legislative approval was required. *See* AS 38.50.020(a); AS 38.50.140. DNR prepared a report on the proposed exchange as required by AS 38.50.130. The report, which found that the exchange was in the state's interest, and the execution of the "Final Exchange Agreement" concluded administrative proceedings concerning the exchange.

The Tongass Conservation Society (Tongass) filed a timely administrative appeal challenging the exchange as a trade of state "trees for stumps." Tongass alleged that the exchange was made in violation of a number of requirements imposed by state statutes and regulations.

Meanwhile Senate Bill 465, to approve the proposed exchange, was introduced in the

[*] Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

legislature at the request of the governor. The parties stipulated that action on the appeal would be stayed until the legislature acted or failed to act on the bill. SB 465 passed the Senate and was transmitted to the House. It was not brought up for a vote of the House and died when the legislature adjourned.

After the legislature failed to pass SB 465 the parties to the exchange agreement rescinded it. The rescission agreement provided in relevant part:

The [Exchange] Agreement dealt with the exchange of certain lands between the State and [Cape Fox] located within the boundaries of the Ketchikan Gateway Borough, and was subject to legislative approval. The 1992 Alaska State Legislature, however, adjourned without approving it.... In light of the legislature's failure to act, and for other reasons, the parties agree to rescind their [Exchange] Agreement....

Tongass then simultaneously moved to dismiss its appeal and for attorney's fees and costs, seeking attorney's fees of $7,707.50 and costs of $215.35. Tongass's theory underlying the motion for attorney's fees and costs was that it was the prevailing party because the relief it sought had occurred, the appeal was a catalyst in bringing about the relief, and the appeal was not frivolous. DNR opposed Tongass's motion on a number of grounds which were summarized in the introduction to the State's opposition to the motion:

Tongass is not the prevailing party in this appeal. It did no more than file a notice of appeal, a statement of points, and a stipulation to delay the deadline for preparing the record, before the State forced it to dismiss its appeal as moot. Moreover, the points Tongass raised were meritless and nonjusticiable, although its appeal admittedly proved to be an effective lobbying tool.

The superior court ruled in favor of Tongass, awarding it attorney's fees of $5,900 and costs of $136.29.

■ On appeal the State raises the same points that it asserted in opposing Tongass's motion in the superior court. We agree with the State's contention that the motion presented a nonjusticiable question and thus reverse.

Attorney's fees and costs in a civil case may be awarded to a prevailing party as a matter of course under Civil Rule 82. In an administrative appeal, attorney's fees and costs may be awarded to a prevailing party in the discretion of the court under Appellate Rule 508.[1] Tongass argues that an appellant may be regarded as a prevailing party in a case where the appellee, after an administrative appeal is filed, acts unilaterally to effect the relief requested by the appellant. According to Tongass, the appellant must show that the appeal was a "catalyst" in bringing about the appellee's unilateral action and that the appellant's claims were not frivolous. Tongass acknowledges that no Alaska cases have adopted this approach as a matter of state law, but contends that this is the approach taken by federal authorities where federal fee-shifting statutes such as 42 U.S.C. § 1988 are involved. *E.g., Hennigan v. Ouachita Parish Sch. Bd.*, 749 F.2d 1148, 1151–53 (5th Cir.1985); *see also Idaho Conservation League, Inc. v. Russell*, 946 F.2d 717, 719 (9th Cir.1991); *Associated Builders & Contractors, Inc. v. Orleans Parish Sch. Bd.*, 919 F.2d 374, 378 (5th Cir.1990). For purposes of this case we assume that this method is appropriate.

It is apparent that utilization of this method in the present case requires an inquiry as to why the legislature failed to pass SB 465. Tongass's goal in filing the appeal was to prevent the land exchange from occurring. This goal was accomplished because the legislature did not approve the exchange. The question is, using Tongass's method of analysis, whether the appeal was a catalyst in producing the legislature's inaction.[2] This is,

---

**1.** *Kodiak Western Alaska Airlines, Inc. v. Bob Harris Flying Serv. Inc.*, 592 P.2d 1200, 1204–05 (Alaska 1979).

**2.** Our review of the record convinces us that the appeal's possible effect on the legislature is the only catalytic relationship that finds support in the evidence. Further, it appears that the superi-

in our view, a political question which is nonjusticiable.

We have long recognized that courts should not attempt to adjudicate political questions. *Abood v. League of Women Voters,* 743 P.2d 333, 336 (Alaska 1987); *Malone v. Meekins,* 650 P.2d 351, 356 (Alaska 1982). This principle stems primarily from the separation of powers doctrine. " '[I]t is the relationship between the judiciary and the coordinate branches of the ... Government ... which gives rise to the "political question." ' " *Malone,* 650 P.2d at 356 (quoting *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962)). *See also Abood v. Gorsuch,* 703 P.2d 1158, 1160 (Alaska 1985) ("There are certain questions involving coordinate branches of the government, sometimes unhelpfully called political questions, that the judiciary will decline to adjudicate.").

■ As our statement in *Abood v. Gorsuch* suggests, it is sometimes difficult to define what is, and what is not, justiciable.

It is not possible to draw the exact boundary separating justiciable and nonjusticiable questions.

> Justiciability is of course not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures, including the appropriateness of the issues for decision ... and the actual hardship to the litigants of denying them the relief sought.

*League of Women Voters,* 743 P.2d at 336 (quoting *Poe v. Ullman,* 367 U.S. 497, 508–09, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961) (Frankfurter, J., plurality opinion)).

To aid in the identification of nonjusticiable political questions we have employed the approach adopted by the United States Supreme Court in *Baker v. Carr. See League of Women Voters,* 743 P.2d at 336; *Malone,* 650 P.2d at 357. We explained in *Malone*

or court's order declaring Tongass the prevailing party expressly relied on this link.

The State's decision to abandon its efforts to pursue the land trade was a direct response to the legislature's inaction, not a response to the pendency of the appeal. It is true that *formal* rescission of the trade agreement was prompted by Tongass's threat to pursue the appeal. But DNR's decision to declare formally dead an agreement that was already politically dead cannot be viewed as a victory on the merits of the lawsuit for Tongass.

Timing is a key indicator of catalytic effect. Here, the State abandoned its efforts to pursue the land trade shortly after the legislature adjourned without taking action on the proposed trade. This suggests that DNR complied with Tongass's demand to rescind the trade agreement, not to render moot a lawsuit that would have otherwise raised live issues, but rather to avoid litigation over an agreement that was already moot as a matter of political reality—an agreement the State had no interest in pursuing for reasons wholly independent of the lawsuit.

The suggestion of political motivation inherent in the timing of DNR's decision to rescind finds confirmation in statements in two affidavits filed by the State in opposition to Tongass's request for attorney's fees. These statements indicate that the Department of Law and DNR were prepared to defend Tongass's lawsuit if the disputed land trade agreement stood any chance of future legislative approval, and decided to rescind only when DNR concluded that the agreement was a lost cause politically.

The superior court found the timing of the State's rescission of the land trade agreement to

be inconclusive; the court also found no other evidence establishing the precise reasons underlying the State's decision to rescind. What the court found clear, however, was that the lobbying efforts pursued by Tongass based on the appeal had influenced the legislature's decision not to act on the proposed land trade and that, in turn, the legislature's failure to act had ultimately influenced the State's decision to rescind:

> The reasons why DNR ultimately chose not to reintroduce the bill are not clear. What is clear is that [Tongass] and the Sierra Club exerted considerable efforts to protest the land sale exchange. These lobbying efforts prompted a few Senators to state their concerns on the record. In fact, the court record today indicates no reason why DNR chose not to reintroduce the same bill *except* for pressure exerted by [Tongass] and the Sierra Club. Therefore, this court holds that [Tongass's] actions were an "impetus" to the rescission agreement.

(Emphasis in original.) This passage seems to explicitly declare Tongass a prevailing party based on the theory that the appeal enabled Tongass to win a political victory, which influenced DNR's decision to rescind. It shows further that the superior court declared the evidence insufficient to prove any other catalytic effect, or "impetus."

Under the federal "catalyst" approach Tongass bore the burden of proof on the catalyst issue. Tongass has not proved that the appeal acted as a catalyst in some sense other than the appeal's influence on the legislature's failure to approve the proposed trade.

that the Supreme Court in *Baker* had identified

> various elements, one or more of which is "[p]rominent on the surface of any case held to involve a political question...." These elements included: (1) a textually demonstrable commitment of the issue to a coordinate political department; [and] (2) the impossibility of a court's undertaking an independent resolution of the case without expressing lack of respect due coordinate branches of government....

650 P.2d at 357 (citing *Baker*, 369 U.S. at 217, 82 S.Ct. at 710). Another element identified in *Baker* as one which may characterize a political question is "a lack of judicially discoverable and manageable standards for resolving" the issue in question. 369 U.S. at 217, 82 S.Ct. at 710. Germane to this, one commentator has observed "the [political question] doctrine is justified when the Court cannot be assured of full clarification of the relevant questions because of difficulties of access to information." Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 2.16, at 296 (2d ed. 1992) (citing Fritz W. Sharpf, *Judicial Review and the Political question: A Functional Analysis*, 75 Yale L.J. 517 (1966)).

Each of these elements exists in the present case. Our constitution commits to the legislature the duty to enact laws. Likewise, the legislature must approve land exchanges involving state land having a value of more than $5,000,000. AS 38.50.020(a); AS 38.50.140. Imputing a motive to the legislature for failing to act risks expressing a lack of respect for that branch of government. Further, there are no "judicially discoverable and manageable standards" which might be used to resolve the question as to why the legislature failed to take a particular action.

■ A number of authorities support these conclusions. In general, judicial inquiries into the motives of those enacting or rejecting proposed legislation are to be avoided. *South Carolina Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1257 (4th Cir.1989), *cert. denied*, 493 U.S. 1077, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990). "Such inquiries endanger the separation of powers doctrine, representing a substantial judicial 'intrusion

into the workings of other branches of government.'" *Id.* (quoting *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 268 n. 18, 97 S.Ct. 555, 565 n. 18, 50 L.Ed.2d 450 (1977)); *see also Wallace v. Jaffree*, 472 U.S. 38, 74, 105 S.Ct. 2479, 2499, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring) ("[A] court has no license to psychoanalyze the legislators."); *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968) ("Inquiries into congressional motives or purposes are a hazardous matter."); Frank H. Easterbrook, *Statutes' Domains*, 50 U.Chi.L.Rev. 533, 547 (1983) ("Because legislatures comprise many members, they do not have 'intents' or 'designs,' hidden yet discoverable. Each member may or may not have a design. The body as a whole, however, has only outcomes.").

The following statement by Justice Scalia suggests some of the many reasons that could lead a legislator to vote for a particular piece of legislation:

> [D]iscerning the subjective motivation of those enacting the statute is, to be honest, almost always an impossible task. The number of possible motivations, to begin with, is not binary, or indeed even finite.... [The legislator] may have thought the bill would provide jobs for his district, or may have wanted to make amends with a faction of his party he had alienated on another vote, or he may have been a close friend of the bill's sponsor, or he may have been repaying a favor he owed the majority leader, or he may have hoped the Governor would appreciate his vote and make a fundraising appearance for him, or he may have been pressured to vote for a bill he disliked by a wealthy contributor or by a flood of constituent mail, or he may have been seeking favorable publicity, ... or, of course, he may have had (and very likely did have) a combination of some of the above and many other motivations.

*Edwards v. Aguillard*, 482 U.S. 578, 636–37, 107 S.Ct. 2573, 2605–06, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting). We have recognized that ascertaining the legislature's true motive is "a task which more often than

not would be impossible." *Gulf Oil Corp. v. State, Dep't of Revenue*, 755 P.2d 372, 386 n. 39 (Alaska 1988). These considerations apply with even greater force when the court is asked to evaluate why the legislature failed to take action. Such a question is fundamentally unanswerable.

We conclude, therefore, that an inquiry into why the legislature failed to approve SB 465 involves a political question which is inappropriate for judicial resolution.[3] Asking whether the appeal, rather than, for example, vigorous lobbying, or a collective perception of good public policy, prompted the legislature not to act amounts to "an unwarranted intrusion into the business of the [legislature]," on a subject on which there is a "textually demonstrable commitment" by our constitution to the legislature, on which the court cannot opine without the risk of "expressing lack of respect" for the legislative branch, and involves an issue on which there is "a lack of judicially discoverable and manageable standards for resolving." *See Ma-*

*lone*, 650 P.2d at 356–57; *Baker*, 369 U.S. at 217, 82 S.Ct. at 710. Since the award of attorney's fees and costs to Tongass was dependent on the resolution of a nonjusticiable question, the award must be REVERSED.

COMPTON, J., dissents.

MOORE, C.J., and EASTAUGH, J., not participating.

COMPTON, Justice, dissenting.

I agree with the court that an inquiry into why the legislature enacts or fails to enact legislation involves a political question which is inappropriate for judicial resolution. Op. at 1020. I disagree, however, with the court's assertion that this is the issue in the present case. Op. at 1017–18. In fact, the legislature's motives do not need to be considered in any degree to resolve the issue of whether Tongass was the prevailing party and therefore entitled to attorney's fees.[1]

---

**3.** We are aware of one case in which a court reviewed the motives of a co-equal legislative body in order to determine whether litigation served as a catalyst to passage of legislation which mooted a claim. In *Paris v. U.S. Dep't of Housing and Urban Dev.*, 988 F.2d 236 (1st Cir. 1993), plaintiffs challenged a tenant selection scheme under which public housing managers skipped over low income families on the waiting list for public housing. *Id.* at 237. While the lawsuit was pending, Congress passed a curative amendment prohibiting housing agencies from by-passing low income families on waiting lists. *Id.* The conference report accompanying this bill specifically stated that it was necessary in light of the *Paris* case. *Id.* at 238. Subsequent to the curative amendment, plaintiffs voluntarily dismissed their claim and moved for attorney's fees under 42 U.S.C. § 1988 and a similar fee-shifting provision of the Fair Housing Act, 42 U.S.C. § 3613(c)(2). *Id.* at 239. The Court of Appeals concluded that attorney's fees under the federal fee-shifting statutes should be awarded (assuming another test which is not here relevant was met) since, given the conference report, the suit could fairly be characterized as a catalyst of the amendment. *Id.* at 241–42. The Court of Appeals observed that the litigation "affected a 'material alteration of the legal relationship of the parties in a manner which Congress sought to promote' in the fee-shifting provisions of the Fair Housing Act with respect to the government, and in § 1988 with respect to [another defendant]." *Id.* at 241 (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1493–94, 103 L.Ed.2d 866 (1989)). *Paris* is distinguishable from the

present case in a number of important respects. First, it involved legislative action, rather than inaction. Second, the action was accompanied by a clear statement of legislative intent recognizing the lawsuit and thus the lawsuit's role as a catalyst in bringing about the statutory change. Third, federal fee-shifting statutes such as 42 U.S.C. § 1988 are purposive in nature. They are designed to achieve congressional goals by encouraging litigation, whereas the objective of Appellate Rule 508 (and Civil Rule 82) is neutral, awarding some measure of compensation for attorney's fees to whichever party has prevailed. *See Tobeluk v. Lind*, 589 P.2d 873, 876, 879 (Alaska 1979). While these differences narrow in state cases of a "public interest" nature, the analogy is still not exact. *See id.* at 878 n. 11, 879–80; *Hickel v. Southeast Conference*, 868 P.2d 919, 923–26 (Alaska 1994) ("Unlike Alaska's approach, the federal approach is extremely generous in granting prevailing party status...."). Public interest status is a judge-made doctrine of general application, in contrast to fee-shifting statutes which have specific legislatively targeted goals. In view of these differences it is understandable that a greater intrusion into the legislative domain may be justified under fee-shifting statutes.

**1.** The court quotes the State's opposition to Tongass's motion for attorney's fees, Op. at 1017, but fails to note that the State's assertion that "the majority of the fees Tongass requests are not related to its efforts before this court, but were incurred lobbying the legislature" is a misstate-

The court correctly states that "Tongass's goal in filing the appeal was to prevent the land exchange from occurring." *Id.* The court then erroneously concludes that "[t]his goal was accomplished because the legislature did not approve the exchange." *Id.* Tongass's goal of preventing the land exchange was not accomplished until the State formally rescinded the Agreement. Thus, the question presented is not, as the court states, "whether the appeal was a catalyst in producing the legislature's inaction," *id.*, but whether the appeal was a catalyst in producing the State's decision to rescind the Agreement.[2]

Section (4)(B) of the superior court's *Order Granting Partial Attorney's Fees* is entitled "Whether TCS has proven a causal connection between its lawsuit and DNR's rescission of the exchange agreement." The superior court noted Senate Bill 465's passage by the Senate, having been aired before three Senate committees during which "potential problems with the bill received considerable attention," its passage by one House committee, and its death in the House when it was never brought to a vote before the committee of second referral. The superior court then noted that a Division of Natural Resources (DNR) manager reported to the DNR Commissioner that the exchange proposal would require enough modification to necessitate further hearings, but that

> [n]o reasons are stated why the proposal required modification. However, the State of Alaska specifically requested [ ] that the Ketchikan [Gateway] Borough and the Cape Fox Corporation rescind the land exchange proposal in part because "[t]he State is obligated to defend the lawsuit by the Tongass Conservation Society unless the agreement is terminated."

The superior court noted the agreement's language referring to the legislature's failure to act "*and for other reasons* " as justification for the agreement. The "*other reasons* " were not specified. The superior court framed the crucial question as why DNR decided not to present the proposal during the next legislative session. Again noting the exchange's passage by three Senate Committees and one House Committee, the

---

ment. Tongass requested 39.7 hours in fees for the appeal and 15 hours in fees for lobbying efforts. The superior court awarded full fees for the appeal, but reduced the award of fees for lobbying to 7.5 hours.

2. The court's discussion concerning Tongass's actions as a catalyst, and the ensuing discussion regarding the justiciability of political questions, is not consistent with the view it expresses in footnote 2, which is keyed to those discussions.

The court frames the question as whether, "using Tongass's method of analysis, [ ] the appeal was a catalyst in producing the legislature's inaction." It concludes by holding "that an inquiry into why the legislature failed to approve SB 465 involves a political question which is inappropriate for judicial resolution." (Footnote omitted.) Since the superior court predicated its decision on the legislature's failure to act, which was the result of Tongass's lobbying efforts, the decision was based on an impermissible inquiry into legislative motivation, a political question.

Notwithstanding the above analysis, it is clear from footnote 2 that the court itself has concluded that the State decided to abandon the land exchange contract for its own political reasons, an inquiry into the political motivations of a coordinate branch of government. While the court declares that the superior court impermissibly inquired into political motivation with respect to the legislative branch, it feels free to do so with respect to the executive branch:

> The suggestion of political motivation inherent in the timing of DNR's decision to rescind finds confirmation in statements in two affidavits filed by the State in opposition to Tongass's request for attorney's fees.

Op. at 1018, n. 2.

The court next quotes the superior court's reference to Tongass's lobbying efforts, stating that "[t]his passage seems to explicitly declare Tongass a prevailing party based on the theory that the appeal enabled Tongass to win a political victory, which influenced DNR's decision to rescind." Op. at 1018, n. 2. Its own uncertainty is embodied in the word "seems." Arguably the passage is not free from ambiguity, and if it is ambiguous, the result should be a remand for clarification. However, it must be remembered that of the hours sought to be recompensed, 39.7 were for the appeal and 15 for lobbying efforts, the latter reduced to 7.5 by the superior court. Further, the rescission agreement itself declared that it was "the legislature's failure to act, and [ ] other reasons," which resulted in the formal termination of the exchange agreement. Until then the State could not unilaterally dismiss the administrative appeal. Tongass was free to argue that the public interest exception to the mootness doctrine justified maintaining the appeal. That position would not have been frivolous.

court observed that "[t]he only other evidence of potential problems with the proposal was the threatened lawsuit. DNR in fact concedes that the 'appeal ... proved to be an effective lobbying tool.'" The superior court concluded that "[b]ecause TCS has a legal basis for its claims, because its appeal acted as an impetus to the rescission, and because it substantially obtained the relief it sought, TCS is the prevailing party to the action." The record supports the superior court's conclusion that the "appeal acted as impetus to the rescission."

It is often difficult to determine a defendant's motive for settling a case because "defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways." *Posada v. Lamb County, Texas,* 716 F.2d 1066, 1072 (5th Cir.1983). Because of this difficulty, federal courts have developed an objective test which emphasizes the "chronology of events" as an important element in determining causation. *See id.* ("Clues to the provocative effects of the plaintiff's legal efforts are often best gleaned from the chronology of events....") The chronology of events in the present case supports the superior court's conclusion that there was a causal connection between Tongass's suit and the State's decision to rescind the Agreement.

After the State, Cape Fox, and the Borough arrived at an agreement, the State sought the required legislative approval. In the interim, Tongass filed an administrative appeal, challenging numerous procedures followed, or not followed, by the State. When the State was unable to obtain legislative approval, it informed Tongass it would not seek that approval again. Tongass did not deem that advisement sufficient to protect its interests, and demanded rescission of the Agreement before it would dismiss its appeal. The State specifically requested that the Borough and Cape Fox rescind the land exchange proposal in part because "[t]he State is obligated to defend the lawsuit by the Tongass Conservation Society unless the agreement is terminated." In the words of a Department of Law attorney, the State had an interest in rendering Tongass's appeal "unequivocally moot." It was only following rescission, the ultimate resolution of the problem from Tongass's standpoint, that Tongass dismissed the appeal. This chronology supports the superior court's conclusion that the suit filed by Tongass was an impetus for the rescission of the Agreement.

The superior court awarded Tongass attorney's fees after concluding that Tongass "substantially obtained the relief it sought." I would hold that the court did not abuse its discretion in awarding Tongass attorney's fees. I would therefore affirm its award.