ALASKA CENTER FOR THE ENVIRON-MENT, Alaska Sportfishing Association, Lynn Canal Conservation, Northern Alaska Environmental Center, Sierra Club, Southeast Alaska Conservation Council, Susitna Valley Association, and Trout Unlimited, Appellants,

v.

STATE of Alaska, Appellee.

No. S–5776.

Supreme Court of Alaska.

June 13, 1997.

Thomas S. Waldo, Sierra Club Legal Defense Fund, Inc., Juneau, for Appellants.

Brian D. Bjorkquist, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, EASTAUGH and FABE, JJ.

*OPINION*

FABE, Justice.

I. *INTRODUCTION*

The Alaska Center for the Environment *et*

al.[1] (collectively, ACE Intervenors) appeal the superior court's decision not to award them attorney's fees for their intervention in litigation involving reconstitution of the mental health trust under *State v. Weiss,* 706 P.2d 681 (Alaska 1985). We reverse, holding that the superior court abused its discretion by denying the ACE Intervenors' motion for attorney's fees.

## II. *FACTS AND PROCEEDINGS*

### A. *The Mental Health Trust*

In 1956, the United States Congress granted one million acres of federal land to "be administered by the Territory of Alaska as a public trust" for the benefit of the mental health program of Alaska. Alaska Mental Health Enabling Act, Pub.L. No. 84–830 § 202(e), 70 Stat. 709 (1956). The State managed these lands without maintaining a separate account until 1978 when it "made its practice law" with the passage of a statutory provision redesignating the trust land as general grant land. *State v. Weiss,* 706 P.2d 681, 682 (Alaska 1985) (citing Ch. 181, § 3(a), SLA 1978 (Redesignation Legislation)). In 1982, a class action was filed alleging that the State "breached the public trust by 1) failing to account for revenues realized, 2) using revenues for purposes other than mental health care and 3) passing legislation redesignating the property 'general grant land.'" *Weiss,* 706 P.2d at 682. Members of the class

> sought declaratory relief invalidating the redesignation legislation; injunctive relief compelling the state to administer the trust according to the law; general relief establishing a trust account for the receipt of funds generated from all lands selected by the State of Alaska under the aforesaid mental health land grant.

*Id.*

The superior court held that the State breached its duties as trustee by removing the federal grant lands from the trust, but it refused to invalidate the Redesignation Legislation. *Id.* Instead, the court ordered the State to pay fair market value for all lands conveyed from the trust as of the date of conveyance plus interest. *Id.*

On appeal, we held that "Congress intended to create a trust, to be based on a corpus of one million acres of federal land," and that the State breached its duties as trustee. *Id.* at 683 & n. 3. We invalidated the Redesignation Legislation and remanded with the direction to reconstitute the trust "to match as nearly as possible the holdings which comprised the trust when the 1978 law became effective." *Id.* at 684. In 1985, only about thirty-five percent of the original trust land remained unencumbered and in state ownership. The State had transferred about 50,000 acres to private individuals, 40,000 acres to municipalities, and 350,000 acres to legislatively designated areas such as state forests, parks, and wildlife areas.

On remand, several groups intervened in the litigation. These included the Alaska Mental Health Association *et al.* (AMHA Intervenors), Anita Bosel *et al.* (Bosel Intervenors), and H.L. *et al.* (H.L. Intervenors). In 1987, based on discussions among the parties, the legislature enacted a proposed settlement under which the State would compensate the trust for the use of former trust lands by paying "rent" of eight percent of the fair market value of those lands. Ch. 48, § 2, SLA 1987 (Chapter 48). The legislature repealed Chapter 48 after a dispute arose over the fair market value of the original trust land and provided instead that the State would pay six percent of unrestricted general fund revenues annually to the trust. Ch. 210, § 2, SLA 1990. This solution, however, also foundered due to opposition by some plaintiffs.

After the failure of Chapter 48, plaintiffs obtained a preliminary injunction prohibiting the State from continuing to transfer trust lands or any interest in trust lands pending final resolution of the litigation. In addition, the plaintiffs filed notice of *lis pendens* on all original trust lands.

At the end of the 1991 legislative session, the legislature made another attempt at set-

---

1. The Alaska Sportfishing Association, Lynn Canal Conservation, Northern Alaska Environmental Center, Sierra Club, Southeast Alaska Conservation Council, Trout Unlimited, and Susitna Valley Association join this appeal.

tlement, known as "Chapter 66." Ch. 66, SLA 1991. Under Chapter 66, the trust would have been reconstituted wholly through a land exchange. The trust would have retained approximately half of its original holdings, and plaintiffs would have nominated land of equal value from other state land to replace the remainder. The settlement agreement incorporating Chapter 66 was supported by Weiss and the AMHA Intervenors (collectively, Settling Plaintiffs), and opposed by the Bosel and H.L. Intervenors (collectively, Dissenting Plaintiffs).

As security to ensure that the State complied with the process to reconstitute the trust, Chapter 66 "hypothecated"[2] certain lands to the mental health trust. The Department of Natural Resources prepared a list of these lands (Hypothecated Lands List) and provided it to the Settling Plaintiffs, but it was kept confidential and not revealed even to legislators until after the governor signed Chapter 66 into law. The superior court explained the role of the hypothecated lands as follows:

> Title to the land remains in the State unless the State defaults on its obligations to return original mental health trust lands to the trust . . ., to convey substitute lands to the trust . . ., or to allocate funds to the Trust Income Account. . . . If the State defaults or if the trust is not reconstituted by December 1, 1994, the hypothecated lands can be foreclosed in a manner to be determined by the Alaska Supreme Court.

### B. *The Intervention by the ACE Intervenors*

In response to the passage of Chapter 66, the ACE Intervenors moved to intervene in the litigation. The superior court granted the motion by stipulation, and the ACE Intervenors filed a complaint December 3, 1991. Their intervention took three forms: (1) their opposition to the joint motion to modify the preliminary injunction and release the *lis pendens* (*lis pendens* motion); (2) their summary judgment motion on their complaint in intervention (summary judgment motion); and (3) their opposition to the motion for preliminary approval of the settlement agreement.

### 1. *The opposition to the lis pendens motion*

After the Settling Plaintiffs and the State submitted the proposed Chapter 66 settlement agreement to the superior court for preliminary approval, they jointly moved to modify the preliminary injunction prohibiting the State from transferring trust lands or any interest in trust lands pending final resolution of the litigation. They also moved to release the *lis pendens* on the original trust lands that the State or a municipality had conveyed or had agreed to convey to a third party.

The ACE Intervenors opposed this motion, arguing:

> The problems with the joint motion stem from two provisions. First, the plaintiffs are allowed to reassert their claims to the disputed third party land if the settlement does not win final court approval. This will, of course, lead to additional litigation over competing claims to trust land. Second, if any of the trusts' [sic] claims are cut off as a result of the joint motion, the State must compensate the trust, almost certainly through exchanges of other public lands. This will lead to controversy and likely litigation not only between the State and plaintiffs over the value of lands, but with local residents and citizens who are opposed to the loss of additional public lands to the trust. . . .

> Moreover, this mess may not result in any meaningful relief to the third parties that supposedly stand to benefit. In the plaintiffs' view, the motion prevents the creation of any new bona fide purchasers, allowing the plaintiffs to reassert all claims to the disputed land. . . . If this view is correct, the joint motion is nothing more than a temporary, cruel hoax played on the third parties. The plaintiffs will be able to

---

**2.** *Black's Law Dictionary* 742 (6th ed. 1990) defines "hypothecate" as follows: "To pledge property as security or collateral for a debt. Generally, there is no physical transfer of the pledged property to the lender, nor is the lender given title to the property; though he has the right to sell the pledged property upon default."

snatch back the land the motion purports to release.

If the plaintiffs' view is incorrect, the burden of the parties' failure will fall on the multitude of Alaskans who use the public lands for all their diverse purposes. The State will have to exchange lands currently designated for multiple use in the broad public interest to the trust for mental health purposes.

The Dissenting Plaintiffs also opposed the motion. They argued, along with the ACE Intervenors, that granting the *lis pendens* motion would provide only illusory relief to third parties. In addition, the Dissenting Plaintiffs argued that releasing the *lis pendens* would place the plaintiff class at risk if the proposed settlement did not take effect.

The trial court denied the motion in January 1993, adopting several of the arguments advanced by ACE. Specifically, the court stated that "[i]f the settling plaintiffs are correct and no bona fide purchasers can be created, the 'relief' in this motion becomes nothing more than a cruel hoax visited on the third parties." The superior court also agreed with the Dissenting Plaintiffs that granting the motion would subject the class to undue risk if the settlement failed. In addition, the court agreed with the ACE Intervenors that if the Settling Plaintiffs were incorrect and the plaintiffs could not reassert their claims to the land, "the public interest may be adversely affected by the transfer of additional public lands over and above the original trust lands" to compensate the trust.

#### 2. *The summary judgment motions*

The superior court next considered the ACE Intervenors' complaint challenging Chapter 66. Four of their eleven claims alleged that the adoption of the Hypothecated Lands List violated the state constitution; two alleged that the process for selecting land for the reconstituted trust violated statutory safeguards; two dealt with the inclusion of mineral lands in the trust; one addressed the management of all lands in the reconstituted trust; one addressed the management of forest lands returned to the trust; and one alleged that the appropriation of land to the trust violated the state constitution.

The ACE Intervenors requested the superior court to "[r]efuse to approve the proposed settlement of this litigation as set forth in Chapter 66." They also asked the court to enter declaratory judgments in accord with their claims that Chapter 66 violated the constitution, the State's fiduciary duty, and the Alaska Statehood Act. Alternatively, if the court would approve the settlement, the ACE Intervenors requested that it enter declaratory judgments that the Trust Authority is not exempt from statutory mandates governing land use, classification, and management. Finally, the ACE Intervenors requested an award of costs and attorney's fees.

On summary judgment motions by the ACE Intervenors, the State, and the Settling Plaintiffs, the superior court ruled in April 1993 for the ACE Intervenors on their claim that the adoption of the Hypothecated Lands List unconstitutionally delegated legislative power. The court also ruled for the ACE Intervenors on their claim that the conveyance of substitute land to the trust was subject to "the planning and classification provisions of AS 38.04 and AS 38.05." The court ruled against the ACE Intervenors on all the other claims. The ACE Intervenors, the State, and the Settling Plaintiffs all appealed.[3]

#### 3. *The opposition to preliminary approval of the settlement agreement*

The superior court next turned to the motion by the State and the Settling Plaintiffs for preliminary approval of the settlement agreement. The ACE Intervenors argued that the proposed settlement was not in the public interest because it excluded the public from involvement in managing and selecting large tracts of public land for the trust and

**3.** This court granted the ACE Intervenors' motion to dismiss these appeals, except for the attorney's fee issue, as moot on April 14, 1995.

injured the public by removing that land from public use.

On December 30, 1993, the superior court entered a decision denying the motion for preliminary approval. Although it found that the agreement was the product of "serious, informed, noncollusive negotiations" and rejected the ACE Intervenors' argument that the proposed settlement was not in the public interest, the superior court concluded that the agreement had "serious deficiencies." It stated:

> The agreement provides for termination at will by either party at any time, even after final approval of the settlement, when specific events arise. Specifically, the agreement allows either party to terminate the agreement: (1) if the superior court does not cancel the lis pendens and modify the preliminary injunction issued in July 1990, within 120 days of presentation of the motion to accomplish that goal; (2) if a "final order" is entered which requires the application of the land use planning provisions of AS 38.04 and AS 38.05 to the reconstitution of the trust; (3) if a "final judicial order" declares the hypothecation of the lands on the Hypothecated Lands list to be ineffective; and (4) if it is "finally held" that conveyance of the mineral estate of the original trust lands or substitute lands to the Alaska Mental Health Trust Authority is a violation of section 6(i) of the Alaska Statehood Act. The first three of these events have already occurred. Thus, either party may terminate the agreement at any time for any reason, even one unrelated to the problem. These termination provisions make the agreement illusory; it is not binding on either side. Moreover, the provisions conflict with the court's obligation in class actions to protect the rights of unnamed class members, who are bound by the litigation even though they never participate in it. Additionally, the court has serious concerns about the enforceability of the agreement without the hypothecation of state lands.

The trial court stated that "[i]f the serious deficiencies noted are corrected, the parties may resubmit their agreement."

The superior court also considered the impact of the ACE Intervenors' successful claims on the viability of the settlement agreement. It found the invalidation of the Hypothecated Lands List to be particularly troubling:

> The hypothecated lands were the security for the state's performance . . . .

> The court believes that any agreement reached by the parties must have workable enforcement guarantees to warrant final approval. The hypothecation option, had the list been validly adopted, was a sufficient enforcement guarantee. It is not clear to the court that the other options are sufficient. If nothing is changed, the settling parties would carry a heavy burden at final approval to prove that there were sufficient enforcement guarantees.

In its conclusion, the trial court reiterated its "serious concerns about the enforceability of the agreement without the hypothecation of state lands." In addition, the court commented that although its ruling that the reconstitution of the trust was subject to land classification and planning requirements would not prevent preliminary approval, "the question remains whether the agreement is 'doable' if reconstitution is subject to [those] provisions."

Following the court's decision, the State abandoned implementation of Chapter 66, and the legislature adopted a new approach to settlement in a special session following the regular 1994 legislative session. Chs. 5, 6, FSSLA 1994. This proposal, known as HB 201, adopted many of the Chapter 66 provisions to improve the mental health program, but reconstituted the trust with a specific "land package," $200 million, and other benefits such as the creation of the Alaska Mental Health Trust Authority and special funding mechanisms. The superior court granted final approval to the HB 201 settlement on December 6, 1994.

C. *The ACE Intervenors' Motions for Attorney's Fees*

The ACE Intervenors requested attorney's fees and costs incurred during their intervention. In August 1994, the superior court denied these motions, finding that the ACE

Intervenors were not "the prevailing party." It reasoned:

> The [ACE] Intervenors raised eleven issues, many of which were complex, constitutional issues of first impression. They prevailed on two of those issues: (1) the legality of the hypothecated lands list included in Chapter 66 and (2) the applicability of the land use planning provisions of AS 38.04 and AS 38.05 to the reconstitution process. These two issues were not the most important in the case nor can they be characterized as the "main issue" in the case. The [ACE] Intervenors maintain that they are the prevailing party, because their actions led to the satisfaction of their goal, *viz.* the rejection of the Chapter 66 settlement.

> This argument fails for two reasons. First, it is factually incorrect. The court denied preliminary approval to the Chapter 66 settlement agreement because the agreement was flawed. It allowed unilateral termination of the agreement if any of four circumstances arose. Three of those had arisen, two as the direct result of the [ACE] Intervenors' endeavors. However, the problem with the agreement would have existed even if the [ACE] Intervenors had not entered the lawsuit. The court would still have denied the request to modify the preliminary injunction and release the *lis pendens* on private third-party purchasers' land. That would have made the automatic, unilateral termination possible. The court would have denied preliminary approval.

> Second, the argument is legally incorrect. Whether a party prevails in litigation is not determined by whether the goals are met, but rather whether the party succeeds on the main issue in the case. An example may illustrate the difference. A party may sue another with the goal of forcing that party into bankruptcy. That goal may be achieved despite the fact that the plaintiff does not prevail on the main issue in the case, which is unrelated to the bankruptcy. The costs of litigation and the impact of the litigation on the defendant's business may accomplish the goal.

The superior court reaffirmed its position in March 1995. The ACE Intervenors appeal.

### III. *DISCUSSION* [4]

■ A prevailing party under Alaska Civil Rule 82 [5] is a party "who has successfully prosecuted or defended against the action, the one who is successful on the 'main issue' of the action and 'in whose favor the decision or verdict is rendered and the judgment entered.'" *Adoption of V.M.C.*, 528 P.2d 788, 795 n. 14 (Alaska 1974) (quoting *Buza v. Columbia Lumber Co.*, 395 P.2d 511, 514 (Alaska 1964)). With few exceptions, the party who obtains an affirmative recovery is considered prevailing. *Hillman v. Nationwide Mut. Fire Ins. Co.*, 855 P.2d 1321, 1327–28 (Alaska 1993) (finding only two cases "where the party who obtained an affirmative recovery" was properly held not to be the prevailing party). We do not require a party to prevail on all the issues in the case to be a prevailing party. *Day v. Moore*, 771 P.2d 436, 437 (Alaska 1989) (holding that plaintiff who succeeded in one of three claims and defeated a counterclaim was prevailing party).

■ The ACE Intervenors contend that approval of the Chapter 66 settlement agreement was the main issue in this case. We agree. As the ACE Intervenors point out, the rejection of the settlement agreement was the focus of their intervention and the "principal relief" they sought. The State suggests no alternative conclusion. Indeed, both the State's arguments and the superior court's decision confirm our view; while never expressly identifying the main issue, the State and the trial court analyze the success

---

4. We review an award of attorney's fees for abuse of discretion. *Hillman v. Nationwide Mut. Fire Ins. Co.*, 855 P.2d 1321, 1326 (Alaska 1993). Designation of the prevailing party is committed to the broad discretion of the trial court. *Id.* We will affirm the trial court's determination unless it is arbitrary, capricious, manifestly unreasonable, or improperly motivated. *Id.*

5. Alaska Civil Rule 82(a) provides:

> Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule.

of the intervention solely in relation to the preliminary approval decision.

■ Having identified the main issue, we need take only a short step to conclude that the ACE Intervenors were prevailing parties. Although the superior court did not adopt all of the ACE Intervenors' arguments or vindicate all their claims, it unambiguously denied preliminary approval of the settlement agreement. The ACE Intervenors were thus "successful on the 'main issue' of the action" and "the decision or verdict [was] rendered and the judgment entered" in their favor. *Hillman*, 855 P.2d at 1327 (citations omitted). Therefore, we hold that the ACE Intervenors were a prevailing party, and the superior court abused its discretion in denying their motion for attorney's fees.

The State, echoing the reasoning of the superior court, argues that rejection of the settlement agreement represented merely the achievement of the ACE Intervenors' "goal," not "relief." It contends that a "'goal' merely reflects the party's policy agenda, and may or may not be directly tied to the party's legal claims," while "'[r]elief' ... is what the party requests the trial court grant as a direct consequence of the party actually winning on legal claims." The State concludes that, because the "ACE [Intervenors'] efforts did not lead directly ... to the materialization of their goal" and the superior court would have denied preliminary approval even if they had not intervened in the litigation, the superior court properly denied them attorney's fees.

We do not accept the State's premise that prevailing party status depends on whether a party's legal arguments "directly," "primarily," or necessarily cause the court's favorable decision. The State does not cite any authority for this position, and we find no precedent to support it. Indeed, such an approach, akin to "causation" analysis in tort law, places the trial court in the awkward position of attempting to evaluate the impact of a party's arguments on the court's own decisions. The result, no matter how fairminded the court, would be a highly subjective ruling. Therefore, we disagree that the superior court properly based its decision on an assessment of ACE's role in causing it to reject the settlement agreement. Rather, the superior court should have asked the simpler and more objective question of whether ACE obtained the relief it sought.

This case, involving many parties seeking a myriad of overlapping objectives in multistage litigation, presents a more complex situation than a case involving a dispute between two parties over money damages. The causal relationship between the legal claims and arguments and the final result was far from straightforward or "direct." However, the complexity of this litigation does not justify abandoning the basic principles that govern the determination of prevailing party status. By attempting to weigh the relative importance of the ACE Intervenors' contributions to its rejection of the settlement agreement, the superior court overlooked the fundamental fact that the ACE Intervenors won the ruling they sought. The superior court's decision unfairly denied the ACE Intervenors the benefit of Rule 82 and must therefore be reversed.[6]

## IV. CONCLUSION

For the above reasons, we hold that the superior court abused its discretion by not granting the ACE Intervenors' motions for attorney's fees. We therefore REVERSE the superior court's decision and REMAND for further proceedings consistent with this opinion.

---

**6.** We distinguish this holding from our recent decision in *State, Department of Natural Resources v. Tongass Conservation Society*, 931 P.2d 1016 (Alaska 1997). There we held that the award of costs and attorney's fees to Tongass was dependent on resolution of a nonjusticiable question and thus had to be reversed. *Id.* at 1020. Here we are not called upon to inquire into why the legislature failed to take particular action, but whether ACE prevailed in the context of particular motions presented to the superior court for its determination.