*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, INC., | ) ) ) | Supreme Court No. S-16793 |
| Appellant, | ) ) | Superior Court No. 3AN-13-09162 CI |
| v. | ) ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT OF NATURAL RESOURCES and ALASKA MENTAL HEALTH TRUST AUTHORITY, | ) ) ) ) ) | No. 7478 – August 21, 2020 |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances: Thomas E. Meacham, Anchorage, for Appellant. Colleen J. Moore, Senior Assistant Attorney General, and Jessica Alloway, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, and Carney, Justices, and Eastaugh, Senior Justice.[*] [Maassen, Justice, not participating.]

BOLGER, Chief Justice.
WINFREE, Justice, concurring in part and dissenting in part.

---

[*]     Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

STOWERS, Justice, dissenting in part.

## I.    INTRODUCTION

This appeal arises from a dispute over a parcel of land. The State selected this parcel in 1989 under an Alaska Statehood Act provision allowing State selections of federal lands for community centers and recreational areas. In the 1990s, in order to settle litigation about the State's management of lands granted to Alaska under the Alaska Mental Health Enabling Act (Mental Health Act), the State agreed to create a mental health trust. There were extensive negotiations over which lands would be included in this trust. In the course of these negotiations, the State agreed that the parcel selected under the Statehood Act would not be conveyed to the mental health trust, but rather would be classified and managed by the State as wildlife habitat. For years after this settlement, the State managed the parcel as wildlife habitat.

By the mid-2000s there were still remaining State entitlements to federal lands; the State and the federal government entered negotiations over remaining entitlements. In 2009 the State and the federal government executed an agreement finalizing the Mental Health Act selections. One of the terms of the agreement was that the parcel selected under the Statehood Act would be converted to a Mental Health Act selection. The parcel was conveyed by the federal government to the State, and the State subsequently conveyed the parcel to the mental health trust.

A lawsuit was filed against the State to invalidate the transfer of the parcel to the mental health trust, based primarily on the arguments that the transaction violated contractual and statutory terms of the earlier mental health trust settlement and violated the constitutional public notice requirement for disposing of an interest in State land. The superior court ruled for the State, and the unsuccessful litigant appeals. For the reasons that follow, we reverse in part and remand for further proceedings consistent

with this opinion.

## II.    FACTS AND PROCEEDINGS

### A.    Mental Health Trust Litigation And Settlement

In 1956 the Alaska Mental Health Enabling Act authorized the Territory of Alaska to select and take title to one million acres of defined, available federal public domain in Alaska to administer in trust for mental health programs.[1]  The State legislature in 1978 authorized the use of trust lands for non-trust purposes;[2] much existing trust land was then sold or otherwise encumbered.[3] Representatives of Alaskans with mental health needs brought a class action lawsuit in 1982, claiming that disposing of trust lands breached the State's fiduciary duties under the Mental Health Act.[4]  When that litigation first reached us in *Weiss I*, we invalidated the statute authorizing use of trust land for non-trust purposes,[5] and ordered that the trust corpus be reconstituted "to match as nearly as possible the holdings which comprised the trust when the 1978 law became effective."[6] And we attempted to guide the superior court by noting that original trust lands still held by the State should be included in the trust along with some form of

---

[1]    Alaska Mental Health Enabling Act, Pub. L. No. 84-830, § 202(a), (e), 70 Stat. 709, 711-12 (1956).

[2]    Ch. 181, § 3(a), SLA 1978; *see Weiss v. State* (*Weiss II*), 939 P.2d 380, 383 (Alaska 1997).

[3]    *Weiss II*, 939 P.2d at 383.

[4]    *State v. Weiss* (*Weiss I*), 706 P.2d 681, 682 (Alaska 1985).

[5]    *Id.* at 683.

[6]    *Id.* at 684.

-3-                                                          **7478**

reimbursement for original trust lands no longer held by the State.[7]

In 1991 the legislature enacted a statute, commonly called "Chapter 66," authorizing a settlement to reconstitute the trust through substitution of other state lands to be agreed upon by the class action plaintiffs and Department of Natural Resources (DNR).[8] Chapter 66 established the Trust Authority to serve as trustee of the reconstituted trust[9] and provided that if the parties could not reach an agreement by December 1994, the trust could be reconstituted by lands to be identified by DNR in a default list.[10] A proposed settlement was drafted, winning the support of some, but not all, of the plaintiffs.[11] A group that included Southeast Alaska Conservation Council, Inc. (SEACC), referred to as the "ACE Intervenors" (ACE/SEACC), intervened to challenge Chapter 66 and the proposed settlement.[12] ACE/SEACC feared that Chapter 66 and the proposed reconstitution settlement would include valuable wildlife habitat and recreational land without adequate planning and public participation safeguards, and that use of these lands would be narrowed for generating revenue. In April 1993 the superior court granted ACE/SEACC summary judgment on 2 of its 11 claims, ruling that the legislature impermissibly had delegated its lawmaking authority by approving DNR's prospective default lands list before seeing its contents, and that the

---

[7]     *Id.* at 683-84.

[8]     Ch. 66, § 55, SLA 1991.

[9]     *Id.* § 26.

[10]     *Id.* § 56; *see also Alaska Ctr. for the Env't v. State*, 940 P.2d 916, 918 (Alaska 1997).

[11]     *Alaska Ctr. for the Env't*, 940 P.2d at 918.

[12]     *Id*. The organizations were referred to as the "ACE Intervenors" because Alaska Center for the Environment (ACE) was the first listed party in pleadings.

conveyance of substitute lands to the trust was subject to the land use requirements.[13] ACE/SEACC, plaintiffs who supported the proposed settlement, and the State appealed various aspects of the superior court's decision.[14]

In December 1993, pending resolution of the issues appealed, the superior court denied preliminary approval of the proposed settlement because its terms were unenforceable.[15] The superior court also voiced grave doubts about the viability of any settlement based on Chapter 66, given that the court had (1) invalidated the default lands list that was supposed to provide security, and (2) ruled that any lands the parties agreed to convey to the trust would be subject to land use planning.[16] The State then repudiated the Chapter 66 settlement framework, and the parties renewed negotiations.[17]

In 1994 the legislature enacted another statute, commonly called "HB 201," authorizing a settlement on modified terms.[18] HB 201 incorporated a list of substitute lands for conveyance to the trust (Other Lands List) that had been negotiated by the parties,[19] including ACE/SEACC. Page 27 of the Other Lands List specified that three parcels — including one referred to as No Name Bay — would not be conveyed to the reconstituted trust, but instead would be designated as wildlife habitat and managed by DNR.

---

[13]    *Id*. at 919.

[14]    *Id*.

[15]    *Id*. at 920.

[16]    *Id.*

[17]    *Weiss v. State* (*Weiss II*), 939 P.2d 380, 385 (Alaska 1997).

[18]    Ch. 5, FSSLA 1994.

[19]    *See id.* § 40(a)(2).

In several related court filings ACE/SEACC asserted that it had played a central role in negotiating the specific lands on the Other Lands List to be conveyed — and not to be conveyed — under the new settlement. ACE/SEACC, however, did not sign either the proposed or final written settlement agreement ending the litigation.

Shortly before the superior court granted preliminary approval of the HB 201 settlement agreement, ACE/SEACC moved to dismiss its separate pending appeal on its Chapter 66 claims, vacate the superior court's judgment on those claims, and dismiss its intervention complaint without prejudice on the ground that its Chapter 66 claims were mooted by HB 201. ACE/SEACC argued that vacatur and dismissal were proper because they would allow ACE/SEACC to bring similar claims if the legislature enacted future laws similar to Chapter 66.

The State opposed vacatur and dismissal of ACE/SEACC's complaint, arguing that even if HB 201 had mooted those causes of action, the HB 201 settlement agreement granted ACE/SEACC a number of concessions in an effort to secure its support and quiet its legal claims stemming from the mental health trust litigation. The State argued it would be unfair to allow ACE/SEACC to challenge the settlement in the future simply because it had not signed the settlement agreement. The State pointed to page 27 of the Other Lands List to illustrate its assertion that specific concessions were made to secure ACE/SEACC's support of the settlement. We granted ACE/SEACC's motion to dismiss its appeal, although we did not vacate the superior court's judgment denying preliminary approval of the proposed settlement or its grant of partial summary judgment to ACE/SEACC.

The original plaintiffs and one of the plaintiff-intervenors in *Weiss I* subsequently challenged HB 201, eventually leading to our *Weiss II* decision upholding

the settlement and ending the litigation.[20] *Weiss II* did not concern any of the issues in the present case.

### B.  Status Of No Name Bay

Section 6(a) of the Alaska Statehood Act authorized the State to select 800,000 acres of unappropriated land from the federal public domain for community centers and recreational areas — up to 400,000 acres of which were to be vacant and unappropriated lands within national forests.[21]  In 1989 DNR selected No Name Bay, located on Kuiu Island in the Tongass National Forest, under § 6(a) as a national forest community grant (NFCG) selection. The selected No Name Bay parcel was designated NFCG-299.

But in 1993 the federal Bureau of Land Management (BLM) classified the selection as a "top filing" under the Alaska National Interest Lands Conservation Act (ANILCA).[22]  This meant the parcel was not "available" within the meaning of § 6(a), but its selection would receive tentative approval automatically upon availability.[23] ANILCA allowed the State to select 25% more land than it was entitled to under the Statehood Act, with approval granted in order of priority decided by the State; ANILCA

---

[20]     *Weiss II*, 939 P.2d at 402.

[21]     Pub. L. No. 85-508, § 6(a), 72 Stat. 339, 340 (1958).  The § 6(a) grant was in addition to the § 6(b) general purpose grant of about 102 million acres to be selected from the unappropriated public domain.  *See id.* § 6(b).

[22]     *See* Pub. L. No. 96-487, § 906(e), 94 Stat. 2371, 2439 (1980).

[23]     *Id.* ("Each such selection application, if otherwise valid, shall become an effective selection without further action by the State upon the date the lands included in such application become available within the meaning of [§ 6(a) of the Statehood Act] . . .").

also allowed the State to change selections and priorities pending tentative approval.[24]

Shortly after DNR selected No Name Bay, the federal Forest Service proposed reserving several rights-of-way for road construction and timber harvest on the parcel. DNR's concurrence was required before encumbering lands already selected under the Statehood Act,[25] and DNR granted its concurrence. In *Southeastern Alaska Conservation Council, Inc. v. Pekovich*, SEACC sued DNR, alleging that granting the concurrence for federal rights-of-way across No Name Bay without prior public notice violated the Public Notice Clause, article VIII, section 10 of the Alaska Constitution, as this concurrence disposed of interests in state lands.[26] The superior court ruled in the case that, although the State did not own No Name Bay, "state lands, or interests therein" included selections under § 6(a) of the Statehood Act within the meaning of the Public Notice Clause. The court reasoned that the Public Notice Clause embraced future federal land grants because when the Constitution was drafted territorial Alaska owned almost no land and was relying on vast land grants from the federal public domain to secure a new government. The superior court therefore invalidated DNR's concurrence. DNR did not appeal the decision. The HB 201 settlement followed about two months later.

After the HB 201 settlement was reached, DNR undertook a public process regarding whether to renew its concurrence on the rights-of-way and timber harvest, ultimately deciding to allow only a temporary road. DNR explained that although it had

---

[24]    *Id.* § 906(f). The Alaska Land Transfer Acceleration Act, discussed below, amended ANILCA to exclude top filings for purposes of calculating whether the State's selections exceeded its entitlement, meaning that the State's total selections — including top filings — could exceed its entitlement by more than 25%. Pub. L. No. 108-452, § 404(a)(4), 118 Stat. 3575, 3593-94 (2004).

[25]    § 906(k), 94 Stat. at 2441.

[26]    No. 1JU-93-00823 CI (Alaska Super., Feb. 11, 1994).

not classified No Name Bay, which the State did not own, it had reviewed the proposed rights-of-way "in light of [DNR's] commitment to classify this land as 'Wildlife Habitat.' " DNR justified its decision to allow only a temporary road by invoking the "need[] to honor [its] commitment" under HB 201 to manage No Name Bay as wildlife habitat. Elsewhere it characterized this commitment as "a political trade off made by DNR, intended to resolve the [mental health trust] issue." And in a letter to a state representative explaining the limited concurrence, the DNR commissioner again referenced the prior "commitment to classify [No Name Bay] as 'Wildlife Habitat Land.' "

Later DNR documents also referenced the commitment to manage No Name Bay as wildlife habitat as part of the HB 201 settlement. In a letter to the regional national forest supervisor, the DNR commissioner wrote that, as a result of negotiations to settle the *Weiss* litigation, "a decision was made to designate these lands as wildlife management land." DNR's 2000 land-use plan for southcentral and southeastern Alaska classified No Name Bay to be managed for its "high habitat values," noting that "[u]nder the Mental Health Settlement, this land is to be designated habitat and managed accordingly."

In 2004 Congress enacted the Alaska Land Transfer Acceleration Act (Acceleration Act).[27] Section 103 of the Acceleration Act allowed the State to convert general purpose selections made under § 6(b) of the Statehood Act to community development selections under § 6(a). Section 106(a) of the Acceleration Act authorized the Interior Secretary to "enter into a binding written agreement with the State" concerning "land remaining to be conveyed under each entitlement established or confirmed by" the Alaska Statehood Act. Although neither the Acceleration Act nor the

---

[27] 118 Stat. 3575.

Statehood Act mentions the 1956 Mental Health Act, DNR and the Trust Authority began negotiations with the Department of Interior to close out Alaska's mental health trust entitlement under the auspices of the Acceleration Act.

DNR, the Trust Authority, and the BLM executed an agreement (Closeout Agreement) in 2009 closing out the State's remaining entitlement under the Mental Health Act. Among other conveyances, the federal government agreed to convey No Name Bay to the State as a Mental Health Act selection, not a Statehood Act § 6(a) selected parcel. In 2010 BLM issued a decision converting No Name Bay from a § 6(a) national forest community grant selected parcel to a mental health selection pursuant to the terms of the Closeout Agreement. In 2012 the federal government conveyed No Name Bay to DNR in partial satisfaction of the State's Mental Health Act entitlement, and DNR then conveyed it to the Trust Authority. The State did not publish any public notice or announcement before executing the Closeout Agreement.

## C.    Current Proceedings

SEACC sued DNR and the Trust Authority in 2013, seeking return of No Name Bay to DNR with instructions to manage it as wildlife habitat. SEACC's relevant complaint included five claims. First, SEACC claimed that by signing the Acceleration Act Closeout Agreement, DNR breached an oral contract — memorialized on page 27 of the Other Lands List incorporated into HB 201 — obligating DNR to manage No Name Bay as wildlife habitat instead of mental health trust land. Second, it claimed that by signing the Closeout Agreement, DNR breached obligations of good faith and fair dealing under the oral contract. Third, it claimed that DNR violated the Public Notice Clause by failing to provide public notice prior to relinquishing its interest in No Name Bay as a Statehood Act § 6(a) selected parcel by executing the Closeout Agreement. Fourth, it claimed that by signing the Closeout Agreement, DNR had violated three statutes: HB 201, specifying that DNR manage No Name Bay as wildlife habitat instead

of mental health trust land; AS 38.05.035(e), requiring DNR to issue written findings before disposing of an interest in state land; and AS 38.05.945(a)(1), requiring DNR to give notice before changing the classification of state land. Fifth, it claimed that the superior court's *Pekovich* decision precludes DNR from arguing that there was not a disposal of an interest in state lands within the meaning of the Public Notice Clause.

SEACC moved for judicial notice that: (1) the selection of No Name Bay as mental health trust land occurred long after the window closed for selections under the Mental Health Act; (2) the parcel was not unreserved and therefore was ineligible for selection under the Mental Health Act; (3) the Acceleration Act did not authorize conversion of Statehood Act § 6(a) selections to Mental Health Act selections; and (4) No Name Bay had not been selected by the deadline set in the Acceleration Act for a parcel to be subject to a binding agreement.

The parties cross-moved for summary judgment on all claims. In October 2015 the superior court granted DNR and the Trust Authority partial summary judgment, ruling that the statutory public notice and written-findings requirements for reclassifying state land were not violated. In July 2017 the superior court granted DNR and the Trust Authority summary judgment on all remaining claims. The orders were not accompanied by explanations for the court's decisions. The court partially granted SEACC's motion for judicial notice, taking notice only of the "existence and language" of the Mental Health Act and the Acceleration Act. In September 2017 the court designated DNR and the Trust Authority as prevailing parties and awarded them attorney's fees.

SEACC appeals the superior court's summary judgment orders, except the order granting summary judgment on the statutory notice and written-findings claims. SEACC also appeals the superior court's order on judicial notice and — based on arguments that the superior court erred on the merits — its designation of DNR and the Trust Authority as prevailing parties entitled to attorney's fees.

-11-                                                                    **7478**

## III. STANDARD OF REVIEW

"We review rulings on motions for summary judgment de novo, 'reading the record in the light most favorable to the non-moving party and making all reasonable inferences in its favor.' "[28] Questions of statutory and constitutional interpretation, res judicata, and collateral estoppel are questions of law that we review de novo.[29] "In conducting de novo review, we will 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[30]

## IV. DISCUSSION

### A. The State Violated The Public Notice Clause Of The Alaska Constitution By Disposing Of An Interest In State Land Without Providing Prior Public Notice.

The Alaska Constitution's Public Notice Clause provides, "No disposals or leases of state lands, or interests therein, shall be made without prior public notice and other safeguards of the public interest as may be prescribed by law."[31] Whether the Public Notice Clause applies in this case presents two questions: (1) whether No Name Bay, as a selected parcel under Statehood Act § 6(a), qualifies as "state lands, or interests therein," and (2) whether the State's exchange of No Name Bay as a § 6(a) selected

---

[28] *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 122 (Alaska 2014) (quoting *Witt v. State, Dep't of Corr.*, 75 P.3d 1030, 1033 (Alaska 2003)).

[29] *See, e.g.*, *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178-79 (Alaska 2009) (regarding statutory and constitutional interpretation); *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 152 P.3d 460, 465 (Alaska 2007) (regarding res judicata and collateral estoppel).

[30] *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1059 (Alaska 2005) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[31] Alaska Const. art. VIII, § 10.

parcel for No Name Bay as a Mental Health Act selection qualifies as a "disposal." Neither party asserts that prior public notice was provided.[32] The State argues that such notice was not constitutionally required because there was not a "disposal" of "state lands, or interests therein."

> **1.    The State is precluded from relitigating whether the Statehood Act § 6(a) selected parcel at No Name Bay constitutes "state lands, or interests therein."**

SEACC cites *Pekovich* for authority that No Name Bay's selection under § 6(a) qualifies as an interest in state land within the meaning of the Public Notice Clause.[33]  SEACC argues that the doctrine of collateral estoppel applies in this case because the parties are the same, the same parcel of land is the subject of both cases, and identical facts about the interest in the land were at issue in *Pekovich*.

"Collateral estoppel is also known as issue preclusion because it requires that a court has decisively adjudicated a particular factual or legal issue."[34]  The doctrine of collateral estoppel applies if:  (1) the party against whom the preclusion is employed was a party to or in privity with a party to the first action; (2) the issue precluded from

---

[32]    In response to questions about public notice, the State points to the public availability of the Closeout Agreement in the Department of Interior *after* it was signed: "Making the Closeout Agreement available for public inspection at the appropriate offices of the Department of the Interior was affirmatively making the existence of the agreement known to the public.  No other public notice or announcement was required." When public notice is required, notifying the public after the State has already committed to an agreement is insufficient.  As we explained in *Baxley v. State*, "The Alaska Constitution does not express a requirement of pre-negotiation notice, and instead can be read to require notice before the State commits to an agreement requiring it to dispose of or lease state lands or interests in state lands."  958 P.2d 422, 432 (Alaska 1998).

[33]    No. 1-JU-93-00823 CI (Alaska Super., Feb. 11, 1994).

[34]    *Angleton v. Cox*, 238 P.3d 610, 614 (Alaska 2010).

relitigation is identical to the issue decided in the first action; (3) the issue was resolved in the first action by a final judgment on the merits; and (4) the determination of the issue was essential to the final judgment.[35]

*Pekovich*, in which DNR was a party, specifically addressed on the merits whether No Name Bay's selection under § 6(a) of the Statehood Act constituted "state lands, or interests therein" within the meaning of the Public Notice Clause. In *Pekovich* the superior court concluded that the selection of No Name Bay was an interest in state land falling within the Public Notice Clause's protection after examining the plain meaning of the language of the Public Notice Clause, the purpose of the provision, and the intent of the framers. The issue of whether there was an interest in state land was essential to the final judgment in *Pekovich*; the final judgment required the State to give public notice before granting the Forest Service's requested concurrence for road reservations and timber harvest in No Name Bay. We therefore conclude that collateral estoppel bars relitigation of this same issue here.

### 2.     The State is not precluded from litigating whether there was a "disposal."

SEACC contends that collateral estoppel precludes the State from relitigating whether there was a "disposal" and that we "should give no weight to the inconsequential factual differences between the statutes involved [or] the type of disposal action" in *Pekovich*. The State counters that it cannot be collaterally estopped by the *Pekovich* decision on the issue of disposal because the Closeout Agreement occurred years after the *Pekovich* case was decided and presents different facts.

In *Pekovich* the superior court addressed whether the concurrences given

---

[35]     *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n, Inc.*, 152 P.3d 460, 468 (Alaska 2007) (citing *Universal Motors, Inc. v. Neary*, 984 P.2d 515, 518 n.11 (Alaska 1999)).

by DNR to the Forest Service for its proposed road reservations and timber harvest on No Name Bay, a parcel selected under § 6(a) of the Statehood Act, were "disposals." In the matter before us, No Name Bay remained a selected parcel under § 6(a) while the State negotiated the Closeout Agreement, requesting that No Name Bay be conveyed to fulfill a portion of Alaska's remaining entitlements under the Mental Health Act. In 2009 the State signed the Closeout Agreement, in which the federal government agreed to convey No Name Bay, among other parcels, to satisfy the State's remaining Mental Health Act entitlement. In December 2010 a BLM decision converted No Name Bay from a § 6(a) selected parcel to a Mental Health Act selection. In May 2012 BLM granted the State patent to No Name Bay as mental health trust land pursuant to the Closeout Agreement. At issue in this case is whether the State disposes of an interest in land when, having selected a parcel of land under one federal entitlement, it then agrees to accept title to that same parcel under a different federal entitlement.

Given that the question is whether a "disposal" occurred within the meaning of the Public Notice Clause, the doctrine of collateral estoppel does not apply to this issue due to the differences in the alleged disposal.

### 3. The State's exchange of its Statehood Act § 6(a) selected parcel for a Mental Health Act selection was a "disposal."

SEACC asserts that the State relinquishing No Name Bay as a Statehood Act § 6(a) selected parcel by converting it to a Mental Health Act selection via the Closeout Agreement was a "disposal" of an interest in state land. SEACC argues that the exchange amounted to a "disposal" because the language of § 6(a), although containing a precatory clause directing that grants be used for community development, did not impose limits on actual uses. By contrast, the federal Mental Health Act created a public trust requiring the State to manage lands for the sole purpose of supporting mental health programs. SEACC thus argues that the State disposed of an interest by relinquishing the

ability to use No Name Bay for a wide range of purposes, including as wildlife habitat.

The State responds it acquired, rather than disposed of, an interest in state land by agreeing to take title to No Name Bay under the Mental Health Act. The State further asserts it did not reduce its total entitlement under § 6(a) because it may substitute another land selection for No Name Bay. According to the State, the Public Notice Clause was therefore not implicated.

The State additionally argues that SEACC's challenge of the State's action is misplaced. Instead, SEACC should have challenged the federal government's decision to convey the land to the State to fulfill remaining entitlements under the Mental Health Act. The State's argument conflates questions of the legality of the federal government's grant of No Name Bay to the State under the Acceleration Act with the distinct question whether the State disposed of an interest in state land under the Alaska Constitution.[36]

We review this question of constitutional interpretation de novo.[37] Our previous cases indicate that the Public Notice Clause should be construed liberally to give effect to the framers' intent of protecting the public's paramount interest in Alaska's

---

[36] We have previously addressed similar arguments. In *Laverty v. Alaska Railroad Corp.*, we considered whether a contract for extraction of gravel on land owned by Alaska Railroad Corporation (ARRC) constituted a "disposal" of "state lands, or interests therein" within the meaning of the Public Notice Clause. 13 P.3d 725, 731 (Alaska 2000). ARRC argued that because of how the federal government granted the land under the Alaska Railroad Transfer Act, the land at issue did not fall within the auspices of the Public Notice Clause. *Id.* at 734. We disagreed, noting that "the transaction was a federal-to-state grant: the federal government gave Alaska all of the federal railroad's lands, allowing the state to designate the form of the state entity that would receive them." *Id.* at 734-35. We further noted, "The way the state chose to take title, hold, and manage those lands is immaterial to whether they are governed by the Alaska Constitution's mandate." *Id.* at 735. The same logic applies here.

[37] *See Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178-79 (Alaska 2009).

land and its resources.[38]  And we reiterate that the framers drafted article VIII conscious of both mismanagement by the federal government and short-sighted exploitation of natural resources by outside business interests.[39]  The discussion at the constitutional convention emphasized that to avoid mismanagement of the natural resources so crucial to Alaska's future as a state, the process for making natural resource allocation decisions among competing users was to occur in full public view.[40]  And the constitutional commentary on section 10 states, "Certain safeguards of the public interest are essential in public lands transactions.  Such transactions may vary in importance from routine matters to those of substantial value."[41]

In analyzing whether there was a "disposal" of an interest in state land under the Public Notice Clause, we have applied the test of whether the interest is

---

[38]    *See Moore v. State*, 553 P.2d 8, 25 (Alaska 1976) ("[W]e must keep in mind the constitutional mandate, expressed in [a]rticle VIII, s[ection] 10, to safeguard the public's interest in the disposition of state natural resources."), *superseded by statute*, Ch. 257, § 3, SLA 1976, *as recognized in Sullivan v. Resisting Envtl. Destruction on Indigenous Lands*, 311 P.3d 625 (Alaska 2013); *Alyeska Ski Corp. v. Holdsworth*, 426 P.2d 1006, 1011 (Alaska 1967) ("[Article VIII] reflects the framers' recognition of the importance of our land resources and of the concomitant necessity for observance of legal safeguards in the disposal or leasing of state lands.").

[39]    *See, e.g.*, VICTOR FISCHER, ALASKA'S CONSTITUTIONAL CONVENTION 130-32 (1975).

[40]    *See, e.g.*, GERALD A. MCBEATH, THE ALASKA STATE CONSTITUTION:  A REFERENCE GUIDE 157-59 (2011).

[41]    Alaska Constitutional Convention Files, Article VIII Natural Resources (C/P 8a), Commentary on Article on State Lands and Natural Resources, 5 (Jan. 16, 1956).

functionally irrevocable.[42] The premise of the functionally irrevocable analysis is that the substance of an interest, not its form, should control.[43] While conducting the functionally irrevocable analysis, we look beyond how the State characterizes an interest, and instead consider what, in practice, is the long-term effect on the State's interest in the land.[44]

We begin our analysis with the State's interest in No Name Bay, a selected parcel under § 6(a) of the Statehood Act. Section 6(a) provides that lands "shall be adjacent to established communities or suitable for prospective community centers and recreational areas," and "shall be selected by the State of Alaska with the approval of the Secretary of Agriculture as to national forest lands."[45]

We next examine the terms of the Closeout Agreement to determine how the agreement impacted the State's interest in No Name Bay. The Closeout Agreement identifies No Name Bay as fulfilling a portion of the State's remaining entitlement under

---

[42]     *Nunamta Aulukestai v. State, Dep't of Nat. Res.*, 351 P.3d 1041, 1057-58 (Alaska 2015).

[43]     *Id.* at 1058.

[44]     *Id.* (concluding granting license that would result in "large-scale and long-lasting changes to the land which cannot be removed without significant damage to it" constituted a "disposal" under the Public Notice Clause); *see also SOP, Inc. v. State, Dep't of Nat. Res., Div. of Parks & Outdoor Recreation*, 310 P.3d 962, 968-69 (Alaska 2013) (concluding terms of seasonal permits granted rights of use analogous to easements, not licenses, and therefore were unconstitutional without prior public notice), *as amended on reh'g* (Oct. 11, 2013); *N. Alaska Envtl. Ctr. v. State, Dep't of Nat. Res.*, 2 P.3d 629, 639 (Alaska 2000) (concluding "[i]n light of the potential long-term environmental damage, the sheer magnitude of the project and concomitant investment of resources, and the asserted critical public importance," right-of-way permit was not functionally revocable and was thus subject to statutory best interest finding).

[45]     Pub. L. No. 85-508, § 6(a), 72 Stat. 339, 340 (1958).

the Mental Health Act. The Mental Health Act § 202(e) provides, "All lands granted to [the State] under this section, together with the income therefrom and the proceeds from any dispositions thereof, shall be administered by [the State] as a public trust and such proceeds and income shall first be applied to meet the necessary expenses of the mental health program."[46] The Mental Health Act thus obligates the State to manage the land in public trust to benefit the mental health program, while the Statehood Act does not impose this obligation.

The language of the Closeout Agreement indicates that the agreement between the State and the federal government is final. The State would not have the opportunity to amend its selections under the Mental Health Act. Of particular relevance, the Closeout Agreement provides:

> Upon execution of this Agreement and conveyance of the lands by BLM to the State of Alaska as provided above, the federal obligation to convey Alaska Mental Health Enabling Act land entitlement shall be deemed satisfied and considered complete.
>
> The State of Alaska shall receive any gain or bear any loss resulting from errors in prior surveys, protraction diagrams, or computation of the ownership of third parties on any land conveyed.
>
> The BLM shall not make any further adjustments to calculations relating to Mental Health acreage entitlement, nor shall the State be entitled to any further conveyances under the Alaska Mental Health Enabling Act.

In signing this agreement, the State committed to receiving No Name Bay as a portion of its Mental Health Act entitlement. Based on the terms of the agreement, there was a

---

[46] Pub. L. No. 84-830, § 202(e), 70 Stat. 709, 712 (1956). For a general overview of the Mental Health Act trust obligations, see *Weiss I*, 706 P.2d 681, 681-82 (Alaska 1985).

"negligible likelihood" that the State would decline to receive No Name Bay under the Mental Health Act, as it would result in permanently forgoing a portion of its mental health entitlement.[47] Upon executing the Closeout Agreement the State therefore made a functionally irrevocable change to its interest in No Name Bay from a § 6(a) selected parcel to a Mental Health Act selection.

Although the State claims that it only received an interest in No Name Bay via the Closeout Agreement,[48] the Closeout Agreement had the effect of taking two actions of legal significance here: first, the State relinquished No Name Bay as a Statehood Act selected parcel, and second, it acquired a new interest in No Name Bay to fulfill a portion of its remaining entitlement under the Mental Health Act. Regardless of the gloss the State applies to this exchange, the simple fact remains that the State cannot accept title to No Name Bay under two different federal entitlements.

And these two federal entitlements have different management requirements. The terms of the Closeout Agreement itself are designed to accommodate the State's new management requirements of No Name Bay under the Mental Health Act. Section 6 of the Closeout Agreement, titled "DNR AND TRUST AUTHORITY AGREEMENT," begins by noting "[t]he terms of this section apply only to DNR and the Trust Authority." Section 6 details a series of conveyances to occur between DNR

---

[47] *See Nunamta Aulukestai*, 351 P.3d at 1061 (concluding there was a "negligible likelihood" that permit would be revoked, satisfying first version of functionally irrevocable test).

[48] The State appears to suggest that because there was not an interest conveyed to any entity outside of the State there could not possibly have been a "disposal" of an interest in state land. This is an unduly narrow reading of the term "disposal." Although this case addresses a question of constitutional interpretation, we note that even the Alaska Administrative Code (AAC) defines a "disposal" of land as an "exchange of land or interests in land to another . . . government agency." 11 AAC 55.280(7) (1994).

and the Trust Authority "upon the signing of this Agreement."  One such conveyance from DNR to the Trust Authority includes "Exhibit B, Priority 1," which is the No Name Bay parcel, providing:  "DNR and the Trust Authority also agree that upon the signing of this Agreement[,] DNR will expeditiously convey to the Trust Authority any remaining, unconveyed lands listed in . . . Exhibit B, Priority 1, to the Trust Authority."  Section 6 of the Closeout Agreement indicates that there was not just a federal-to-state transfer of an interest, as the State insists, but rather there was also a change in the State's interest in the land that necessitated transferring the parcel from DNR to the Trust Authority.

The State cannot circumvent the requirements of the Public Notice Clause by incorporating a disposal of an interest in state land, and an inter-agency transfer to accommodate the new management requirements, within an agreement with the federal government.  As a federal Regional Deputy Solicitor noted about a draft of the agreement, "The provisions are quite awkward in the context of the Agreement because they only involve the internal relationships of two state agencies, [DNR] and the Trust Authority."  And in a letter replying to SEACC's concerns about the DNR to Trust Authority transfer, Alaska's Attorney General clarified that the transfer from DNR to the Trust Authority was solely for administrative ease because the State had already bound itself to manage No Name Bay as mental health trust land:  "Because No Name Bay was conveyed by BLM as mental health trust land, it must be managed as trust land whether it is held by DNR or by [the Trust Authority].  Accordingly, DNR intends to convey it to [the Trust Authority], for convenience in managing it along with all other mental health trust land."

In sum, the State's exchange of No Name Bay as a Statehood Act § 6(a) selected parcel for a mental health trust selection via the Closeout Agreement was a "disposal" of an interest in state lands within the meaning of the Public Notice Clause.

The State was constitutionally required to provide public notice prior to this disposal. We therefore conclude that it was error for the superior court to rule that the State did not violate the Public Notice Clause.

> **B.     The State's Exchange Of Interests In No Name Bay Was Inconsistent With HB 201.**

SEACC argues that the State's conversion of No Name Bay from a Statehood Act § 6(a) selected parcel to a mental health selection conflicted with HB 201. SEACC asserts that HB 201 incorporated the entire Other Lands List, including page 27, creating a statutory mandate that No Name Bay be managed as wildlife habitat. SEACC points to legislative history confirming that the Other Lands List "was the product of parcel-by-parcel negotiations conducted with the knowledge of the legislative committees," and the settlement embodied in the lands lists enabled HB 201 to move forward to passage. SEACC additionally argues this negotiation process, and the incorporation of the resulting lists of lands, satisfied the constitutional concerns raised by Chapter 66.

The State responds that § 40(a)(2) of HB 201 referred to the Other Lands List only to designate the parcels identified as lands to be conveyed to the mental health trust. The State argues that because No Name Bay was identified as a parcel *not* to be conveyed to the trust on page 27, § 40(a)(2) does not incorporate it. It further notes that the text of § 40(a)(2) does not mention page 27 or No Name Bay. SEACC replies that the legislature adopted by incorporation the Other Lands List in its entirety, and there is no indication it "mysteriously failed to adopt or incorporate one single page."

SEACC raises a question of statutory interpretation. We interpret statutes de novo[49] by "look[ing] to three factors:  the language of the statute, the legislative

_____

[49]     *City of Valdez v. State*, 372 P.3d 240, 248 (Alaska 2016).

history, and the legislative purpose behind the statute."[50]   We decide questions of statutory interpretation on a sliding scale:  the clearer the statutory language, the more convincing any contrary legislative history must be to overcome the statute's plain meaning.[51]

HB 201 is self-described as an Act "[r]elating to the mental health land trust and the mental health land trust litigation, *Weiss v. State*."[52]  The settlement agreement resolving *Weiss* includes two lists of land in Attachment A:  the "Other State Land To Be Designated As Trust Land, April 28, 1994," referred to as the Other Lands List, and the "Original Mental Health Land To Be Designated As Trust Land, April 28, 1994." Section 40(a)(2) of HB 201 "designate[s] as mental health trust land" the state lands listed in the Other Lands List.  Page 27 of the Other Lands List, titled "List of Other State Lands," specifies that No Name Bay, along with a few other parcels, "are not to be designated as Mental Health Trust Land.   These parcels will be managed by the Department of Natural Resources for wildlife habitat purposes and are hereby classified as Wildlife Habitat as that term is defined in 11 AAC 55.230."

The State argues that we should look no further than the text of § 40(a)(2) and should disregard the language on page 27.  However, externally referenced land lists are integral in defining which parcels reconstitute the mental health trust and which original mental health parcels are converted to general grant land by HB 201.[53]  In fact,

---

[50]     *Pederson v. Barnes*, 139 P.3d 552, 559 (Alaska 2006) (quoting *W. Star Trucks, Inc. v. Big Iron Equip. Serv., Inc.*, 101 P.3d 1047, 1050 (Alaska 2004)).

[51]     *City of Valdez*, 372 P.3d at 248.

[52]     Ch. 5, FSSLA 1994.

[53]     *Id.* §§ 40-41; *see also id.* § 45 (providing replacement land for municipalities with land on certain lists).

the State itself asserts that we should privilege the language in a footnote of an externally referenced list over the plain text of the statute in neighboring § 41.

Section 41 references external lists of land to confirm the "ratification of conversion of certain original mental health land to general grant land." Section 41(a)(2) provides "land patented to or approved for patent to the state under the Alaska Mental Health Enabling Act after July 1, 1978, and not listed in 'Original Mental Health Land To Be Designated as Mental Health Trust Land, April 28, 1994,' . . . is redesignated as general grant land." Based on this plain text, any land patented to the State under the Mental Health Act after July 1, 1978, and not included in the referenced list would be redesignated as general grant land.

But, as the State notes, page 48 of the Original Mental Health Land List provides in footnote one that "[a]ny additional land conveyed pursuant to the Mental Health Enabling Act after the effective date of [this Act] . . . automatically will be considered as Designated Trust Land." The text of § 41(a)(2) does not specifically reference page 48 or footnote one, or for that matter, any other page of the list, and yet the State acknowledges its significance in the larger statutory scheme. And, as the State notes, given the *Weiss* litigation's focus on resolving the State's previous breach of trust when it redesignated trust land as general grant land, it would be inconsistent with legislative purpose to read the statute to automatically redesignate all future Mental Health Act land conveyances as general grant land. Thus § 41(a)(2) should be read to incorporate the Other Mental Health Land List in its entirety. Reading § 40(a)(2) alongside § 41(a)(2) suggests that the legislature intended to incorporate the referenced Other Lands List in its entirety as well.

The legislative history does not indicate that the legislature intended to exclude particular pages or provisions in the referenced lands lists. Instead, the legislative history includes statements made during committee hearings by

representatives of the parties to the *Weiss* litigation regarding the progress of negotiations on lands to be included in and excluded from the reconstituted trust.[54] After receiving updates on the negotiations, House Committee Co-Chairman Ron Larson stated, "we would like to say we have put [the] mental health [litigation] behind us here, that we have a settlement or a resolution and whatever is necessary." In response to further questions indicating concern from legislators about the time frame and the costs of the matter remaining unresolved, DNR Commissioner Harry Noah explained his belief that a "settlement is the best way to go," and the bill they were working towards would be a settlement as a result of negotiations between the parties.[55] A later draft letter of intent from Committee Co-Chairman Larson explained that HB 201 aimed to address "varied and seemingly incompatible goals" in order to reconstitute the trust while avoiding "backlash against the mental health community." This letter emphasized that HB 201 sought to ensure that "other public interests in the land are taken into consideration and accommodated," and reconstituting the trust would not remove land from parks and wildlife refuges or from the control of the state agencies to which they had been assigned. The legislative history indicates that the legislature intended to finally resolve the *Weiss* litigation in HB 201, and understood compromises were required to reach a settlement that would satisfy the public and the mental health trust beneficiaries. This legislative history is consistent with HB 201 incorporating the referenced lands lists in

---

[54]    Attorney Tom Waldo spoke on behalf of the public interest intervenors before the House Finance Committee, and emphasized that the lands in the lists were identified during an extended process including a wide coalition of affected groups, and that they would be providing the legislature a "package . . . negotiated land list."

[55]    Although negotiations were not completely finalized at the time of this committee hearing, Commissioner Noah noted some "significant parcels" that "received a lot of comment" were removed from the list of substitute lands to be added to the mental health trust.

their entirety.

In considering the legislative purposes behind HB 201, we note § 1(b) indicates that the purposes include "reconstitut[ing] the mental health trust with some original mental health land and some other state land"; "ratify[ing] and confirm[ing] the removal from trust status of some original mental health land"; and "ratify[ing] and confirm[ing] the validity of the dispositions and uses of the original mental health land removed from trust status."[56] HB 201's stated purposes thus contemplate reconstituting the trust by including some lands and excluding other lands from the trust. Ultimately HB 201 was concerned with "resolv[ing] the *Weiss* litigation on terms that are fair to both the public and the beneficiaries of the mental health trust."[57]

Viewing HB 201 in light of its language, legislative history, and legislative purposes leads us to conclude that the legislature intended to incorporate the entire Other Lands List. And page 27 of the Other Lands List states No Name Bay is "not to be designated as Mental Health Trust Land," legislatively classifies No Name Bay as "Wildlife Habitat," and directs DNR to manage No Name Bay "for wildlife habitat purposes." The State's exchange of No Name Bay as a Statehood Act § 6(a) selected parcel for No Name Bay as a Mental Health Act selection was therefore inconsistent with HB 201.[58] We reverse the superior court's summary judgment ruling on this claim.

---

[56]    Ch. 5, § 1(b)(1)-(3), FSSLA 1994.

[57]    *Id.* § 1(a)(15).

[58]    Justice Winfree's dissent invites us to address various scenarios that are not presented in the case before us. But we need go no further to conclude that it was incorrect to grant the State summary judgment on this issue. The dissent also questions whether our holding addresses future legislatures. It does not. As we explained in *Weiss II,* no agreement could bind future legislatures so as to prevent amendment of the HB 201 settlement statutes. 939 P.2d 380, 397 (Alaska 1997).

**C.    The Superior Court Did Not Err By Granting Summary Judgment To The State On SEACC's Contract Claims.**

**1.    The doctrine of quasi-estoppel does not bar the State from taking the position that it did not form a contract with SEACC.**

SEACC argues that the doctrine of quasi-estoppel[59] bars the State from taking the position that the State and SEACC did not have an agreement. SEACC notes that during the earlier litigation of its Chapter 66 claims, the State took the position on appeal that ACE/SEACC was bound by the settlement agreement. We have stated that quasi-estoppel seeks:

> to prevent injustice by precluding a party from asserting a right inconsistent with a position previously taken . . . . The essence of the doctrine of quasi-estoppel is the existence of facts and circumstances making the assertion of an inconsistent position unconscionable. . . . Among the many considerations which may indicate that an inconsistent position is unconscionable and the doctrine of quasi-estoppel should be applied are whether the party asserting the inconsistent position has gained an advantage or produced some disadvantage through the first position.[60]

Although we did not vacate the superior court's judgment or dismiss ACE/SEACC's complaint in the earlier appeal of its Chapter 66 claims, as it requested, ACE/SEACC ultimately was designated a prevailing party and awarded $456,225 in attorney's fees for its intervention. We conclude that the State did not gain an advantage from its position

---

[59]    SEACC also suggests that judicial estoppel precludes the State from taking an inconsistent position from that taken in 1995 during the *Weiss* litigation. Although there is a form of judicial estoppel we have embraced that precludes a party from arguing a new position on appeal contrary to a position taken in the trial court, here the State's change of position was not made in the same case. *See Bruce L. v. W.E.*, 247 P.3d 966, 967 (Alaska 2011).

[60]    *Jamison v. Consol. Utils., Inc.*, 576 P.2d 97, 102 (Alaska 1978).

in the earlier appeal. Even assuming that denial of vacatur and dismissal constituted a gain by the State, we do not believe that gain was so great as to make the State's current position unconscionable. Quasi-estoppel therefore does not bar the State from arguing that ACE/SEACC and the State did not form an oral contract regarding No Name Bay.

### 2. SEACC's oral contract claims fail as a matter of law.

SEACC asserts that it formed an oral or implied contract with the State regarding No Name Bay because there is no single document setting out the terms of the agreement and containing the signatures of both parties. SEACC makes seemingly contradictory assertions that the State both fully performed the terms of their agreement and that the State has ongoing obligations under their agreement. SEACC has argued — before us and before the superior court — that both parties fully performed their obligations under the oral contract in 1994: ACE/SEACC supported the HB 201 settlement before the legislature and in court to settle *Weiss*, and conceded another parcel, Leask Lakes, could be included in the mental health trust replacement lands, and, in exchange, the State agreed not to include the No Name Bay land selection in the trust and that it would instead be managed by DNR as wildlife habitat.

SEACC argues that the HB 201 settlement agreement's provision on page 27 of the Other Lands List, regarding management of No Name Bay as wildlife habitat and not mental health trust land, memorialized the State's side of the agreement with ACE/SEACC. SEACC contends that the State had an ongoing obligation to manage No Name Bay as wildlife habitat under the agreement it reached with ACE/SEACC as embodied on page 27. SEACC asserts that the State breached this agreement by including No Name Bay in the Closeout Agreement to fulfill part of the State's remaining mental health trust land entitlement.

At times SEACC implies that it formed an oral contract with the State outside of the *Weiss* settlement agreement that creates an ongoing State commitment to

manage No Name Bay as wildlife habitat, and at times SEACC suggests page 27 itself is supposed to reflect this ongoing commitment. The substance of the latter argument is not an oral contract claim, but rather boils down to a repackaging of SEACC's argument that page 27 creates a legislative commitment to manage No Name Bay as wildlife habitat. We addressed this claim above.

SEACC's contract claims raise a number of issues, including whether the DNR commissioner's later-signed letters to third parties describing a commitment to manage No Name Bay as wildlife habitat constitute confirming memoranda needed to overcome a Statute of Frauds defense.[61] But we affirm the superior court's grant of summary judgment without reaching these issues because SEACC's oral contract theories fail as a matter of law. If, as SEACC has asserted numerous times, both parties fully performed their obligations under the oral contract, then the State could not have breached that contract.

Consequently, the superior court did not err by granting summary judgment to the State on SEACC's contract claims.

---

[61] Alaska's Statute of Frauds, codified as AS 09.25.010, bars enforcement of certain contracts not in writing and signed by the party against whom enforcement is sought. Contracts covered by the Statute of Frauds include those that "by [their] terms [are] not to be performed within a year from [their] making" and those that "charge or encumber real property." AS 09.25.010(a)(1), (a)(6). The alleged oral contract that SEACC seeks to enforce would fall in both categories.

But a "note or memorandum . . . in writing and subscribed by the party charged" may satisfy the writing requirement. AS 09.25.010(a). A "memorandum may consist of an entry in a diary or in the minutes of a meeting, of a communication to or from an agent of the party, of a public record, *or of an informal letter to a third person*." RESTATEMENT (SECOND) OF CONTRACTS § 133 cmt. b (AM. LAW INST. 1981) (emphasis added).

**D.** **The Superior Court Did Not Err By Partially Granting SEACC's Motion For Judicial Notice.**

SEACC moved for judicial notice that specific provisions of the Mental Health Act and the Acceleration Act barred the State and the federal government from signing an agreement closing out the State's entitlement under the Mental Health Act through conveyance of No Name Bay and other parcels of federal land. SEACC sought judicial notice that the No Name Bay conveyance occurred long after the deadline had passed for selections under the Mental Health Act; that because No Name Bay was national forest land it was not unreserved and therefore was ineligible for selection under the Mental Health Act; that the Acceleration Act, invoked as authority for the Closeout Agreement, did not authorize the conversion of selections under § 6(a) of the Statehood Act to selections under the Mental Health Act; and that the selection of No Name Bay occurred after the deadline for selections eligible for conveyance under the Acceleration Act.

Alaska Evidence Rule 201 authorizes courts to take notice of facts that otherwise would be decided by the trier of fact if those facts are "not subject to reasonable dispute" and are "generally known within this state" or are "capable of accurate and ready determination."[62] Notice may be taken sua sponte, but must be taken upon the request of a party.[63] Rule 202 requires courts to take notice of the common law, statutes, constitutions, rules of court, and regulations of the Alaska and federal governments.[64] Notice of other laws and regulations may be taken sua sponte, but must

---

[62] Alaska R. Evid. 201(a)-(b).

[63] Alaska R. Evid. 201(c)-(d).

[64] Alaska R. Evid. 202(b).

be taken upon the request of a party.[65] Neither Rule authorizes a party to demand that a court interpret or apply the law in a particular way; that is the province of the courts.[66]

SEACC's motion for judicial notice essentially asked the superior court to rule on the legal validity of the Closeout Agreement between the State and the federal government for the conveyances under the Mental Health Act, although SEACC focuses on the conveyance of No Name Bay. SEACC concedes as much in its briefing, stating that the agreement could have been challenged directly on the four grounds on which it now seeks judicial notice, had public notice of the agreement been given. In short, SEACC is attempting to collaterally attack the agreement through judicial notice, without joining the federal government as a party. Because SEACC's motion for judicial notice actually asked the superior court to interpret and apply federal laws in a particular way — against the non-party federal government — its motion fell outside the scope of judicial notice, and the superior court therefore did not err by denying the motion except to take notice of the "existence and language" of the Mental Health Act and the Acceleration Act. Whether the federal government legally could enter into the Closeout Agreement and convey No Name Bay to Alaska was not before the superior court, and it is not before us in this appeal.

## V.    CONCLUSION

The orders of the superior court are AFFIRMED in part, and REVERSED in part. The case is REMANDED so the superior court can fashion a remedy consistent

---

[65]    Alaska R. Evid. 202(c)-(d).

[66]    *See* Alaska R. Evid. 201(a) cmt. ("[I]f the fact involved tends to show that general conduct X is or is not, or should or should not, be against the law (or unconstitutional), it is for the court to consider freely . . . ."); *Huntington v. State*, 151 P.3d 523, 528 (Alaska App. 2007) (stating that whether to grant mistrial is "a mixed question of fact and law addressed to the discretion of the trial judge" and not covered by Rule 201).

with this opinion and reconsider the prevailing party designation.

WINFREE, Justice, concurring in part and dissenting in part.

My primary disagreement with the court's decision lies in the reversal of the superior court's summary judgment ruling that Southeast Alaska Conservation Council, Inc. (SEACC) had no viable statutory claim under the mental health trust settlement enacted as House Bill (H.B.) 201. Although I agree with the court's affirmance of the superior court's summary judgment ruling that SEACC had no viable oral contract claim, I write separately to explain more fully why I believe that ruling should be affirmed. I reluctantly agree with the court's decision that collateral estoppel bars the State from arguing that its Statehood Act § 6(a) land grant selection of the No Name Bay parcel is not "state land" covered by the Public Notice Clause of the Alaska Constitution; but I wish to make clear that, in my view, the collateral estoppel bar relates only to this particular land grant selection and not to land grant selections in general. I agree with the court's decision that the State violated the Public Notice Clause when, without public notice, it disposed of state land in an exchange of land interests with the federal government; but I wish to make clear that, in my view, the disposal was the exchange of land interests, not the mere relinquishment of a grant land selection. Finally, I agree with the court's decision that the superior court did not err in its application of the judicial notice doctrine, without need for further comment.

**Relevant Land Management Concepts**

The legislature has established policies, consistent with the Alaska Constitution, that state land use should be maximized according to the public interest,[1]

---

[1]    AS 38.05.910 (stating Alaska Land Act policy mirroring article VIII, section 1 of Alaska Constitution); *Alaska Survival v. State, Dep't of Nat. Res.*, 723 P.2d 1281, 1285 (Alaska 1986) ("Alaska's Constitution and the Alaska Land Act, AS 38.05, express a policy of encouraging settlement of the state's lands 'by making them available for maximum use consistent with the public interest.' " (quoting Alaska Const. art. VIII,
(continued...)

that state lands should be managed to establish a balanced combination of both public and private purposes,[2] and that the public or private land use choice shall be determined through inventory, planning, and classification processes established in AS 38.04.060-.070.[3] The legislature has delegated to the commissioner of the Department of Natural Resources (DNR) the duties to inventory state lands and regularly review that inventory to determine the uses best providing for the public interest.[4] The legislature also has delegated to DNR the duty to work with local governments and the public to adopt, maintain, and revise regional land use plans[5] and, in connection with that duty, to classify state lands for various uses.[6]

The legislature left state land use classifications to DNR's discretionary

---

[1] (...continued)
§ 1; AS 38.05.910)), *superseded by statute*, ch. 257, § 3, SLA 1976, *as recognized in Sullivan v. Resisting Envtl. Destruction on Indigenous Lands*, 311 P.3d 625 (Alaska 2013).

[2] AS 38.04.005-.015 (stating general land classification and use policy, public interest in making land available for private use, and public interest in retaining state land in public ownership).

[3] AS 38.04.005(a) (stating general state lands classification and use policy).

[4] AS 38.04.060(a)-(b) (outlining commissioner's duties); AS 38.04.910(1) (identifying "commissioner" as commissioner of natural resources).

[5] AS 38.04.065(a), (d), (e); *see also Denali Citizens Council v. State, Dep't of Nat. Res.*, 318 P.3d 380, 389 (Alaska 2014) (noting statutory duty to engage in regional land use planning does not indicate that plan provisions are legally enforceable against DNR); *State, Dep't of Nat. Res. v. Nondalton Tribal Council*, 268 P.3d 293, 304 n.93 (Alaska 2012) (stating that although regional land use plan guides future DNR policy, it likely is not enforceable by public against DNR).

[6] AS 38.04.065(e) (referring to AS 38.05.300 classification requirements); *see also State v. Wiedner*, 684 P.2d 103, 107 (Alaska 1984) (stating that AS 38.04.065 generally requires land use plans prior to land classifications).

determination of what is "necessary and proper."[7]  And the legislature expressly authorized DNR to reclassify state land when "the public interest warrants reclassification."[8]  But the legislature set limitations on DNR's classification of state lands containing more than 640 contiguous acres:  Only the legislature may act to close that land to multiple-purpose use, and DNR may not, except on an interim basis pending legislative approval, classify that land to preclude mineral exploration and mining unless necessary for a land disposal, land exchange, or certain infrastructure projects.[9]

DNR is the legislatively designated entity for the "selection of grant, lieu and indemnity land" and DNR's land grant selections must conform with the Alaska Land Act and DNR's "policy, orders and regulations."[10]  DNR must give land grant selection preference to lands providing maximum public benefits.[11]  At the other end of the spectrum, land "owned in fee by the state or to which the state may become entitled," with certain exceptions, "may be sold" under statutes specifically relating to selling land for private use.[12]  But these restrictions do not limit dispositions under other statutes,

---

[7]     AS 38.05.300(a); *see also* AS 38.05.020(b)(1) (providing that DNR's land classification orders are not required to be adopted under Administrative Procedure Act).

[8]     AS 38.05.300(a).

[9]     AS 38.05.300(a)(1)-(2), (c).  We have previously discussed Alaska's land use management procedures.  See generally *Nondalton Tribal Council*, 268 P.3d at 294-96; *Alaska Survival v. State, Dep't of Nat. Res.*, 723 P.2d 1281, 1289-91 (Alaska 1986), *superseded by statute*, ch. 257, § 3, SLA 1976, *as recognized in Sullivan v. Resisting Envtl. Destruction on Indigenous Lands*, 311 P.3d 625 (Alaska 2013).

[10]     AS 38.05.290(a).

[11]     *Id.*

[12]     AS 38.05.045 (referencing land disposal for private use under AS 38.05.045-.069 and land disposal for homesteads under AS 38.08).

including AS 38.05.810(a), which authorizes the "lease, sale, or other disposal of state land or resources" to "a state or federal agency" when DNR determines such disposals "serve a public purpose and are in the public interest."[13]

When the legislature authorized DNR in the various ways just described, it delegated to DNR the responsibility to exercise the Legislature's constitutionally vested authority over state lands.[14]  As we have noted in another context, when the legislature delegates its authority to an executive agency, the agency in effect acts as the legislature.[15]  Although it is axiomatic of our government's constitutional structure that the legislature cannot delegate the power to make laws,[16] it equally is fundamental that the legislature may vest its authority — such as authority to manage state lands — in an executive agency such as DNR.[17]  So long as the agency does not exceed its statutory authority, an agency's discretionary action — in effect, acting as the legislature — should be upheld.[18]

### H.B. 201 Issue

I disagree with the court's vague analysis that, because the State's Closeout

---

[13]     *Id.*

[14]     *See, e.g.*, Alaska Const. art. VIII, § 2 ("The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of the public.").

[15]     *See Mallott v. Stand for Salmon*, 431 P.3d 159, 164 n.17 (Alaska 2018).

[16]     *See, e.g.*, *Whitman v. Am. Trucking Assns.*, 531 U.S. 457, 472 (2001).

[17]     *See, e.g.*, *Yakus v. United States*, 321 U.S. 414, 425 (1944), *cited in State v. Fairbanks N. Star Borough*, 736 P.2d 1140, 1143 (Alaska 1987).

[18]     *See Baxley v. State*, 958 P.2d 422, 431-32 (Alaska 1998) (noting DNR commissioner's "broad statutory powers" and declining to find commissioner's act exceeded authority).

Agreement with the federal government is "inconsistent" with H.B. 201, the superior court erred by granting summary judgment dismissing SEACC's statutory claim. The court begs the question: What is the lasting statutory import of (1) placing the No Name Bay land grant selection on the list of state lands not conveyed to reconstitute the mental health trust, and (2) stating that, as of the settlement, the parcel would be classified and managed as wildlife habitat?

Section 40(a)(2) of H.B. 201 "designate[s] as mental health trust land" the Other Lands List parcels.[19] But the Other Lands List specifies at page 27 that the No Name Bay land grant selection is "not to be designated" as mental health trust land, "will be managed by [DNR] for wildlife purposes," and is "hereby classified as Wildlife Habitat." SEACC argues that H.B. 201 incorporated page 27, creating a statutory mandate that the No Name Bay land grant selection be managed as wildlife habitat, apparently in perpetuity. DNR and the Trust Authority respond that § 40(a)(2) referred to the list only to designate the parcels identified as lands to be conveyed to the mental health trust. They argue that because the No Name Bay land grant selection was not identified as a parcel to be conveyed, § 40(a)(2) does not apply to mandate the land grant selection's future management.

The court persuasively concludes that the various land lists were incorporated into H.B. 201 for specific purposes. But this leaves unanswered the necessary statutory interpretation and the meaning of the No Name Bay land grant selection listing on page 27. We interpret statutes by "look[ing] to three factors: the language of the statute, the legislative history, and the legislative purpose behind the

---

[19]    Ch. 5, § 40(a)(2), FSSLA 1994.

statute."[20] Section 40(a)(2)'s language clearly refers to land to be "designated as mental health trust land," as does the Other Lands List's title. Section 40(a)(2) makes no specific mention of lands not to be conveyed to the Mental Health Trust Authority. The parties do not address H.B. 201's legislative purpose, but its purpose indisputably was resolving the mental health trust litigation and reconstituting the trust with existing original mental health land grant property and other State assets necessary to true-up the reconstituted trust. Although settling the mental health trust litigation involved trade-offs about which lands were and were not to be conveyed to the Trust Authority, H.B. 201 ultimately was concerned with reconstituting the mental health trust, not with mandating permanent ownership and use of lands not going into the trust. And nothing about H.B. 201 suggests it specifically mandated that DNR do everything in its power to ensure the No Name Bay land grant selection resulted in an actual land conveyance to the State under Statehood Act § 6(a).

Is the court holding, as a matter of statutory interpretation, that H.B. 201 mandates: DNR cannot, under any possible circumstances (and even with public notice), make an otherwise lawful disposal of the land grant selection? DNR never can change the classification or management scheme for the No Name Bay parcel, whether as a land grant selection or as land if ultimately conveyed to the State? Only the legislature (through specific new legislation), and not DNR under its statutory land management responsibilities delegated by the legislature, can authorize an otherwise lawful disposal or classification change for the No Name Bay parcel, whether as a land grant selection or as land if ultimately conveyed to the State? Or whatever interest the State may hold in the No Name Bay parcel must be classified and managed as wildlife habitat in

---

[20]     *Pederson v. Barnes*, 139 P.3d 552, 559 (Alaska 2006) (quoting *W. Star Trucks, Inc. v. Big Iron Equip. Serv., Inc.*, 101 P.3d 1047, 1050 (Alaska 2004)).

perpetuity regardless of what future legislatures or land managers may think is in the State's best interests?

Absent an explanation of the court's statutory interpretation of H.B. 201, the court fails to make its case that the superior court erred by granting summary judgment dismissing SEACC's H.B. 201 claim. When H.B. 201 went into effect, time had long since expired for Alaska to select additional mental health trust grant lands.[21] Because the No Name Bay land grant selection was placed on the list of property not to be conveyed to the Trust Authority to reconstitute the mental health trust under H.B. 201, there likely was no reason for any party to think the land grant selection, or the land itself, later might make its way to the trust.[22] But the later 2004 federal Alaska Land Transfer Acceleration Act[23] paved the way for State negotiations with the federal government and created a new opportunity for the State to select additional mental health trust lands; this opportunity was entirely separate from the 1990s litigation and settlement leading to the reconstitution of the mental health trust through H.B. 201. This allowed the State to effectively convert its § 6(a) land grant selection of the No Name Bay parcel for a mental health land grant conveyance under the 1956 Mental Health Enabling Act. I agree with the court that this end result is inconsistent with the settlement embodied in H.B. 201, but that alone does not make the later, unconnected Closeout Agreement a statutory violation of H.B. 201.

---

[21]     *See* Alaska Mental Health Enabling Act, Pub. L. No. 84-830, § 202(a), 70 Stat. 709, 711 (1956).

[22]     *Cf. Se. Alaska Conservation Council v. State*, 202 P.3d 1162, 1176-77 (Alaska 2009) (concluding legislative land grant to University was unconstitutional dedication of funds). *But see* AS 38.50.010, .140 (authorizing DNR to make land exchanges, some subject to legislative approval).

[23]     Pub. L. No. 108-452, 118 Stat. 3575 (2004).

As we previously have noted, DNR enjoys "broad discretion in deciding whether to approve a sale, lease or other disposal of state lands."[24] The Acceleration Act represented a changed circumstance, presenting DNR a new opportunity to select additional mental health trust lands. Because DNR has broad authority to manage state lands, and because H.B. 201 did not clearly prohibit the State from an otherwise statutorily allowable disposal of the land grant selection, I conclude the superior court correctly granted summary judgment dismissing SEACC's H.B. 201 claim.

**Oral Contract Issue**

I agree with the court's conclusion that the superior court correctly granted summary judgment dismissing SEACC's oral contract claim. I conclude this issue is resolved entirely by SEACC's superior court assertions and acknowledgment at oral argument to us that the alleged oral contract was fully performed by the State placing the No Name Bay land grant selection on the list of lands not to be conveyed to the Trust Authority to reconstitute the mental health trust under H.B. 201.

SEACC's superior court arguments were based on the affidavit of Tom Waldo, SEACC's attorney in the H.B. 201 litigation and settlement. Waldo described the State's "proposed concessions" to break the negotiation impasse as follows: If his clients agreed that another specified land parcel would go on the list of lands to be conveyed to the Trust Authority to reconstitute the mental health trust, the State would agree that the No Name Bay land grant selection and two other parcels would not "be designated as [m]ental [h]ealth [t]rust [l]and" and the No Name Bay land grant selection "would be classified as 'Wildlife Habitat' under the state land use regulations." Waldo stated that these agreements were "memorialized" on the land lists incorporated into the

---

**24** *Moore v. State*, 553 P.2d 8, 31 (Alaska 1976), *superseded by statute*, ch. 257, § 3, SLA 1976, *as recognized in Sullivan v. Resisting Envtl. Destruction on Indigenous Lands*, 311 P.3d 625 (Alaska 2013).

settlement's enabling legislation. Waldo stated that his clients decided to make this agreement "in the context of the overall settlement agreement." Waldo concluded that the land lists "reflected the final agreement among the settling parties as to the lands that would reconstitute the [m]ental [h]ealth [t]rust."

During the summary judgment proceedings in the superior court, SEACC described the alleged oral agreement as follows:

> The parties agreed that SEACC would support the H.B. 201 settlement before the legislature and would not oppose it in court, which SEACC subsequently performed as agreed. The ACE Intervenors also conceded that [another parcel] could become [mental health trust] replacement land.
>
> As the quid pro quo, Page 27, which precluded three specific tracts of land from designation as [mental health trust] replacement land, as well as specifying their classification and management as wildlife habitat or public recreation land, would be included in the list of "Other State Lands" – but as land not to go to the Trust. Page 27 was contained both in the list of "Other State Lands" that was ratified in Sec. 40(a)(2), ch. 5, FSSLA (1994), and in the *Weiss* Settlement Agreement, incorporated in Section 2, para. 1 . . . .

SEACC further emphasized in its briefing that the alleged oral agreement had been fully performed: "the State-SEACC contract was fully performed"; "[a]fter passage of H.B. 201 and SEACC's non-opposition to the *Weiss* settlement, there remained nothing to be done by either SEACC or the State to further perform their contract"; and "all required performances by both parties occurred within one year."

At oral argument to us, SEACC confirmed that the alleged oral agreement had been fully performed in the 1990s:

> Q: What I want to know is, is this oral agreement comprised of anything that's not in the settlement agreement that was actually reached by the parties in the *Weiss* litigation?

A: No. The oral agreement was on the SEACC side to support the legislation, on the State side to come forward with an agreed list that would be incorporated in that legislation. That agreed list then went into the *Weiss* settlement.

. . . .

A: The land selections . . . went into the settlement agreement by virtue of the fact that it was an agreed solution between the State, and all of the intervening parties, and the plaintiffs, and was adopted by the legislature. SEACC's involvement in the oral agreement was to negotiate the acceptable list of lands and to then support it in the legislation and in the settlement agreement.

Q: And everything to do with that oral agreement was done, complete, *finito* when that settlement agreement was signed, delivered, and sealed back in the 1990s, correct?

A: Everything . . . .

. . . .

Q: Why are we here talking about an oral agreement today?

A: We're talking about it . . . because the oral agreement *at page 27* specified that the No Name Bay lands would remain with the State, they wouldn't go to the trust, and they'd be managed as wildlife habitat lands. And that situation continued until 2007 . . . . (Emphasis added.)

This makes abundant sense: The parties negotiating the H.B. 201 settlement were concerned with the original mental health trust lands available to reconstitute the trust; the original mental health trust lands unavailable to reconstitute the trust; and what other state property would, and would not, be conveyed to the Trust Authority to true-up the reconstituted mental health trust. As a result of the negotiations, the No Name Bay land grant selection was placed on the list of property not to be conveyed to the Trust Authority to reconstitute the trust and was designated to be

classified and managed as wildlife habitat. Any later dispute about what the State was required to do with respect to the No Name Bay land grant selection is a dispute about interpreting H.B. 201, not the contours of an alleged oral contract admittedly fully performed when H.B. 201 was effectuated. For this reason I respectfully disagree with Justice Stowers's separate dissent.

**State Land Issue**

I reluctantly agree with the court's collateral estoppel ruling, effectively barring the State from challenging whether the No Name Bay land grant selection constitutes "state land[], or interests therein" under the Public Notice Clause of article VIII, section 10 of the Alaska Constitution.[25] But my agreement goes no further than the No Name Bay land grant selection. The State did not appeal the superior court's decision in *Southeastern Alaska Conservation Council, Inc. v. Pekovich*,[26] and we have not had occasion to consider whether land grant selections are state land covered by the Public Notice Clause. Although *Pekovich* settles the matter for the No Name Bay land grant selection, it does not establish controlling constitutional law for other land grant selections. This court, not the *Pekovich* superior court, is the final arbiter on the controlling constitutional law.

In *Pekovich* the superior court stressed that the Alaska Constitution was ratified before Alaska became a state. Given that Alaska owned almost no land before statehood and was relying on prospective federal land grants, the court reasoned that it would make sense for the Public Notice Clause to embrace future federal land grants. The court concluded that "interests therein" must include the future interest in grants

---

[25]     Alaska Const. art. VIII, § 10 ("No disposals or leases of state lands, or interests therein, shall be made without prior public notice . . . .").

[26]     No. 1JU-93-00823 CI (Alaska Super. Feb. 11, 1994).

promised to the State and that the State's tentative selection of No Name Bay under § 6(a) of the Statehood Act therefore must fall within the clause's protections. But the State's § 6(a) land grant selection of the No Name Bay parcel was an interest in federal land, not an interest in state land. The superior court did not grapple with whether or why a land grant selection itself is state land for Public Notice Clause purposes.

As the court noted, our prior decisions unequivocally support the principle that the Public Notice Clause should be liberally construed to give effect to the framers' intent of protecting the public's paramount interest in Alaska's land and its resources.[27] But it is not so clear that the framers intended the clause to apply to novel contingent property interests. In *Pekovich* the superior court stressed that the State's future interest in the No Name Bay parcel was not speculative because, after completing procedural requirements, the State would receive tentative approval and equitable title as a matter of course. This seems a concession that the State did not yet have even equitable title to the land when it held a land grant selection not yet tentatively approved by the federal government. And *Pekovich* overlooks the fact that, pending completion of procedural requirements, the federal government could have removed the No Name Bay parcel from selection under the Statehood Act. It is well established that Congress retains the right to remove particular tracts from land selection prior to their approval.[28] For example,

---

[27] *See, e.g.*, *Moore v. State*, 553 P.2d 8, 25 (Alaska 1976) ("[W]e must keep in mind the constitutional mandate, expressed in [a]rticle VIII, s[ection] 10, to safeguard the public's interest in the disposition of state natural resources."), *superseded by statute*, ch. 257, § 3, SLA 1976, *as recognized in Sullivan v. Resisting Envtl. Destruction on Indigenous Lands*, 311 P.3d 625 (Alaska 2013); *Alyeska Ski Corp. v. Holdsworth*, 426 P.2d 1006, 1011 (Alaska 1967) ("[Article VIII] reflects the framers' recognition of the importance of our land resources and of the concomitant necessity for observance of legal safeguards in the disposal or leasing of state lands.").

[28] *See, e.g.*, *Andrus v. Utah*, 446 U.S. 500, 519-20 (1980) (holding Congress
(continued...)

when passing the Alaska National Interest Lands Conservation Act, Congress set aside 104 million acres of federal lands for preservation, closing those lands to selection under the Statehood Act.[29]

A legally valid future interest exists if the grantee may take possession on the occurrence of conditions specified in a grant.[30] But if the grantor may freely revoke the grant, the grantee has only an expectancy in gaining possession.[31] In the context of wills, devises have been described as expectancies that do not create valid property interests during the testator's lifetime, because the testator's property enjoyment should not be limited by the devisee's claims absent a clear commitment to convey an interest.[32] That reasoning may apply in this context as well; Congress enjoys plenary power over the federal public domain prior to a particular parcel's tentative approval and survey under a land grant selection.[33] But if that reasoning does not apply, the decision should be made by this court. Whether a mere land grant selection, without the necessary federal approval to make the land grant selection purely contingent on ministerial

---

[28]    (...continued)
could authorize Interior Department discretion in deciding whether to approve state selections from federal public domain authorized by statehood act in lieu of tracts designated in school land grant); *United States v. Wyoming*, 331 U.S. 440, 443 (1947) (affirming federal government's freedom to dispose of school grant lands prior to survey)..

[29]    Pub. L. No. 96-487, § 906(d), 94 Stat. 2371, 2438-39 (1980); *see also Sturgeon v. Frost*, 136 S. Ct. 1061, 1066 (2016).

[30]    RESTATEMENT (FIRST) OF PROPERTY §§ 25, 158 (AM. LAW INST. 1936).

[31]    *See* SIMES & SMITH, THE LAW OF FUTURE INTERESTS § 403 (John A. Borron, Jr. ed., 3d ed. 2002).

[32]    *See id*.

[33]    *See supra* note 28.

procedural steps, is state land for Public Notice Clause purposes remains an open question.

**Public Notice Issue**

I agree that the Closeout Agreement effected a disposal of the No Name Bay land grant selection requiring notice under the Public Notice Clause. I write separately only to emphasize that the State's mere "relinquishment" of the land grant selection may not — as SEACC urges — be a disposal.

As of 2016 about 5.4 million acres remained under Statehood Act entitlements.[34] Given the State's ability to select more land than remained under its entitlement, it had selected significantly more than 5.4 million acres.[35] And although the Acceleration Act ended the State's ability to make new selections after 2009, the State still may change the priority of its final selections.[36] If a mere relinquishment of a land grant selection is a disposal covered by the Public Notice Clause, then, because the State has over-selected land grant opportunities (as allowed by federal law), even the re-prioritization of land grant selections would be an effective relinquishment of some land grant selections; public notice thus would be required for almost any action the State takes with respect to its land grant selections. Perhaps that ultimately is the correct result and consistent with a need for public oversight of the State's land grant selection management, but this case is not the right vehicle to decide that issue.

---

[34] ALASKA LEGISLATURE, STATE OF ALASKA LAND SELECTIONS (2016), http://www.akleg.gov/basis/get_documents.asp?session=29&docid=40532; *see also* BUREAU OF LAND MGMT., PUBLIC LAND STATISTICS 5 (2019), https://www.blm.gov/about/data/public-land-statistics (showing about 99 million acres had been conveyed under Statehood Act).

[35] *See* ALASKA LEGISLATURE, *supra* note 34.

[36] Pub. L. No. 108-452, § 404(b), 118 Stat. 3579, 3594 (2004).

There was an undeniable disposal in this case because the State exchanged its Statehood Act § 6(a) land grant selection — which for purposes of this case is state land — for the federal government's patented mental health trust land grant conveyance to the State for subsequent conveyance to the Trust Authority. There is no reason to conclude in this case that mere relinquishment of a land grant selection is a disposal subject to the Public Notice Clause.

STOWERS, Justice, dissenting in part.

I dissent from Section IV.C.2. of the court's opinion, which addresses SEACC's oral contract claims.[1]  SEACC alleges that in 1994 it entered into an oral contract with DNR regarding reconstitution of the State's mental health trust.  According to SEACC, it agreed not to challenge the inclusion of a particular tract of land (Leask Lakes) in the mental health trust and to support HB 201 in testimony before the legislature and in the *Weiss* litigation.[2]  In exchange for SEACC's support, SEACC argues that the State agreed to include certain parcels of land — in particular, No Name Bay — in the list of lands that would *not* be conveyed to the trust and to classify and manage No Name Bay as wildlife habitat.

We have outlined Alaska's summary judgment principles as follows:

> We will affirm summary judgment if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law.  The non-movant "need not establish that he will ultimately prevail at trial." That is, the non-movant is *not* required to submit evidence that tends to show that the non-movant could prove its case by satisfying the relevant burden of proof at trial.

> In making this determination, all reasonable inferences are made in favor of the non-movant.  Reasonable inferences are those inferences that a reasonable factfinder could draw from the plaintiff's evidence.  However, the plaintiff must present more than a "scintilla" of evidence to avoid summary judgment; the plaintiff must present enough evidence to "reasonably tend[] to dispute or contradict" the evidence presented by the defendant.

> We have indicated that we will not engage in a weighing of the evidence on summary judgment; there is a

---

[1]     *See* Op. at 28-29.

[2]     *See Weiss v. State (Weiss II)*, 939 P.2d 380 (Alaska 1997).

-48-                                                                          7478

"genuine issue" of material fact as long as the non-movant has presented *some* evidence in support of its legal theory.[3]

Further, "[w]hen factual disputes exist, the non-movant's version of the facts must be accepted as true and capable of proof, and we make no attempt to weigh the evidence or evaluate witness credibility."[4]

To support its cross-motion for summary judgment, SEACC pointed to the following evidence to document its oral contract with DNR: (1) an affidavit filed by SEACC's former attorney, Tom Waldo, describing the negotiations and the oral agreement; (2) the memorandum SEACC filed with the *Weiss II* court to support the proposed settlement; (3) documentation that SEACC testified before the legislature in support of HB 201; and (4) a variety of documents and communications by State employees and officials from 1994 to 2012 that acknowledged No Name Bay's classification as wildlife habitat pursuant to HB 201 and the settlement negotiations.[5]

The court holds that because SEACC conceded that "both parties fully performed their obligations under the oral contract, then the State could not have

---

[3]      *Alakayak v. B.C. Packers, Ltd.*, 48 P.3d 432, 449 (Alaska 2002) (alteration in original) (emphases in original) (footnotes omitted) (first quoting *Gablick v. Wolfe*, 469 P.2d 391, 395 (Alaska 1970); then quoting *Yurioff v. Am. Honda Motor Co.*, 803 P.2d 386, 389 (Alaska 1990)).

[4]      *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 757 (Alaska 2008).

[5]      SEACC pointed to (1) public notices published by DNR, (2) memoranda between DNR and the Alaska Department of Fish and Game, (3) internal DNR communications, (4) communications between DNR and the U.S. Forest Service, (5) communication between DNR and the Office of the Governor, (6) a record of decision and reconsideration published by the DNR Commissioner, and (7) the designation of No Name Bay as wildlife habitat in a 2000 land use planning process. SEACC also notes the supplemental opposition filed by the State with this court in relation to the Chapter 66 litigation where the State asserted that it reached a negotiated settlement with the intervenors in the *Weiss* litigation.

breached that contract" as a matter of law.[6]   But some contracts create ongoing obligations to continue to honor a contract term.[7]   And SEACC has produced evidence showing that the alleged oral contract did just that.  First, Waldo stated in his affidavit that the State made an offer to not designate No Name Bay as mental health trust land and instead to classify the property "as 'Wildlife Habitat' under the State land use planning regulations."  Waldo's affidavit suggests that SEACC understood the State to be offering to have No Name Bay "classified permanently as Wildlife Habitat."  Second, the State documents and communications from 1994 to 2012 acknowledging No Name Bay's classification as wildlife habitat demonstrate that the State did not understand its obligations regarding No Name Bay to be complete after merely including it on the Other Lands List; instead, the State recognized that it was obligated to continue to manage No Name Bay as wildlife habitat.

While SEACC's evidence may not demonstrably prove the existence of an oral contract, SEACC did not need to do so to survive summary judgment.[8]   SEACC presented "some" evidence — "more than a scintilla" — in support of its legal theory, and this evidence was sufficient to show a genuine issue of material fact.[9]   We draw all

---

[6]     Op. at 29.

[7]     *See, e.g.*, *Recreational Data Servs., Inc. v. Trimble Navigation Ltd.*, 404 P.3d 120, 127-29 (Alaska 2017) (discussing nondisclosure agreement that created ongoing obligation on both parties not to disclose confidential information), *as amended* (Aug. 3, 2017).

[8]     *See Alakayak*, 48 P.3d at 449 ("[T]he non-movant is *not* required to submit evidence that tends to show that the non-movant could prove its case by satisfying the relevant burden of proof at trial." (emphasis in original)).

[9]     *Cf. Meyer v. State, Dep't of Revenue, Child Support Enf't Div. ex rel. N.G.T.*, 994 P.2d 365, 368 (Alaska 1999) (holding "a putative father's sworn denial of (continued...)

reasonable inferences in SEACC's favor, and SEACC produced evidence sufficient to draw reasonable inferences that (1) the contract included a term requiring DNR to manage No Name Bay as wildlife habitat into the future and (2) DNR breached this term. Because SEACC raised a genuine issue of material fact on both the existence of the contract term and DNR's breach of this term, I disagree with this court that the superior court properly granted summary judgment to the State on the oral contract issue. I concur in the remainder of the court's opinion.

---

[9]    (...continued)
sexual intercourse during the possible period of conception [was] more than a scintilla of evidence" despite "scientific test results claiming a 99.98% probability of [his] paternity"). *Meyer* illustrates this court's lenient summary judgment standard, and this court has continued to cite it with approval. *See, e.g.*, *Egner v. Talbot's, Inc.*, 214 P.3d 272, 277 n.7 (Alaska 2009); *Estate of Milos v. Quality Asphalt Paving, Inc.*, 145 P.3d 533, 537 (Alaska 2006); *Alakayak*, 48 P.3d at 449.